## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ALICIA KELLY** | * | **CIVIL ACTION** |
| *Plaintiff* | * | |
| | * | **NO. 22-683** |
| **VERSUS** | * | |
| | * | **JUDGE:** |
| **CENTER FOR TOXICOLOGY &** | * | |
| **ENVIRONMENTAL HEALTH, a subsidiary of** | * | **MAGISTRATE:** |
| **MONTROSE ENVIRONMENTAL GROUP,** | * | |
| **INC., a Delaware Corporation, LIONSGATE** | * | |
| **ENTERTAINMENT, INC., a California** | * | **JURY DEMAND** |
| **Corporation, LIONSGATE TELEVISION,** | * | |
| **INC., a California Corporation, JERRY** | * | |
| **BRUCKHEIMER, INC., a California** | * | |
| **Corporation JERRY BRUCKHEIMER** | * | |
| **TELEVISION, INC., a subsidiary of JERRY** | * | |
| **BRUCKHEIMER FILMS, INC., a California** | * | |
| **Corporation, APPLE, INC., a California** | * | |
| **Corporation, APPLE PRODUCTIONS, INC.,** | * | |
| **a California Corporation, APPLE STUDIOS,** | * | |
| **a subsidiary of APPLE, INC., a California** | * | |
| **Corporation, JASON SEALS, CHASE SELBY,** | * | |
| **and JASON BECKNER** | * | |
| *Defendants* | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT FOR DAMAGES

**NOW COMES** Plaintiff, ALICIA KELLY, by and through her attorneys, The Law

Offices of Stephanie L. White, P.C., and complaining of the Defendants, CENTER FOR

TOXICOLOGY & ENVIRONMENTAL HEALTH, a subsidiary of MONTROSE

ENVIRONMENTAL GROUP, INC., a Delaware Corporation, LIONSGATE ENTERTAINMENT,

INC., a California Corporation, LIONSGATE TELEVISION, INC., a California Corporation,

JERRY BRUCKHEIMER, INC., a California Corporation, JERRY BRUCHKHEIMER

TELEVISION, INC., a subsidiary of JERRY BRUCKHEIMER FILMS, INC., a California

1

Corporation, APPLE, INC., a California Corporation, APPLE PRODUCTIONS, INC., a California Corporation, APPLE STUDIOS, a subsidiary of APPLE, INC., a California Corporation, JASON SEALS, CHASE SELBY, and JASON BECKNER, states as follows:

## JURISDICTION AND VENUE

1.     This matter is a claim for personal injuries arising out of conduct on the part of the Defendants involving Sexual Battery, Sexual Harassment, Sexual Discrimination, Wage Discrimination based on Sex, Sex Trafficking, Wrongful Discharge, Intentional Infliction of Emotional Distress, and Negligent Supervision. The claims include violations of Title VII of the Civil Rights Act of 1965, 42 U.S.C. 2000(e), as amended by the Civil Rights Act of 1991, the Trafficking Victims Protection Act of 2000, 18 U.S.C. 1591, *et. seq.,* and the Fair Labor Standards Act of 1938, 29 U.S.C. 206(d)(1).

2.     This Honorable Court has original jurisdiction, pursuant to 28 U.S.C. 1332(a)(1), because the matter in controversy exceeds $75,000, and the parties are citizens of different states.

3.     Venue is proper, pursuant to 28 U.S.C. 1391, because a substantial part of the events giving rise to the claim occurred in the Eastern District of Louisiana, and Defendant, CENTER FOR TOXICOLOGY & ENVIRONMENTAL HEALTH, a subsidiary of MONTROSE ENVIRONMENTAL GROUP, INC., a Delaware Corporation, maintains an office in this District.

4.     Jurisdiction is further vested in this Honorable Court, pursuant to 28 U.S.C. 1331, because Plaintiff's claims are based, in part, upon Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, *et seq.,* the Equal Pay Act of 1963, 29 U.S.C. 206(d), and The Trafficking Victims Protection Act, 18 U.S.C. 1591 *et. seq.*

5.     Pursuant to 28 U.S.C. § 1367(a), this Honorable Court has supplemental jurisdiction over all other claims asserted under the laws of the State of Louisiana.

2

## PARTIES

6.     Plaintiff, ALICIA KELLY, (hereafter "Plaintiff" or "KELLY") is an adult residing in New Orleans, Louisiana.

7.     Defendant, CENTER FOR TOXICOLOGY & ENVIRONMENTAL HEALTH (hereafter "CTEH"), was an Arkansas Limited Liability Company and is now a wholly owned subsidiary of Defendant, MONTROSE ENVIRONMENTAL GROUP, INC., which is a Delaware Corporation.

8.     Defendant, MONTROSE ENVIRONMENTAL GROUP, INC., (hereafter "MONTROSE") is a corporation organized under the laws of the state of Delaware with offices throughout the United States, Canada, and Australia, including an office in New Orleans, Louisiana, and with its principal place of business located at 5120 Northshore Drive, North Little Rock, Arkansas, 72118.

9.     Defendant, LIONSGATE ENTERTAINMENT, INC., (hereafter "LIONSGATE ENTERTAINMENT") is a corporation organized under the laws of the state of California, with its principal place of business located at 2700 Colorado Avenue, Santa Monica, California 90404.

10.    Defendant, LIONSGATE TELEVISION, INC., (hereafter LIONSGATE TELEVISION") is a corporation organized under the laws of the state of California, with its principal place of business located at 2700 Colorado Avenue, Santa Monica, California 90404.

11.    Defendant, JERRY BRUCKHEIMER, INC., (hereafter "BRUCKHEIMER") is a corporation organized under the laws of the state of California, with its principal place of business located at 16030 Ventura Boulevard, Suite 380, Encino, California 91436 and, upon information and belief, the parent company of JERRY BRUCKHEIMER FILMS, INC., and JERRY BRUCKHEIMER TELEVISION, INC.

3

12.     Defendant, JERRY BRUCKHEIMER TELEVISION, INC., (hereafter "BRUCKHEIMER TELEVISION") is a corporation organized under the laws of the state of California with its principal place of business located at 16030 Ventura Boulevard, Suite 380, Encino, California 91436.

13.     Defendant, JERRY BRUCKHEIMER FILMS, INC., (hereafter "BRUCKHEIMER FILMS") is a corporation organized under the laws of the state of California with its principal place of business located at 16030 Ventura Boulevard, Suite 380, Encino, California 91436.

14.     Defendant, APPLE, INC., (hereafter "APPLE") is a corporation organized under the laws of the state of California with its principal place of business located at One Apple Parkway, Cupertino, California 95014 and, upon information and belief, is the parent company of APPLE PRODUCTIONS, INC., and APPLE STUDIOS.

15.     Defendant, APPLE PRODUCTIONS, INC., (hereafter "APPLE PRODUCTIONS") is a corporation organized under the laws of the state of California with its principal place of business located at One Apple Parkway, Cupertino, California 95014.

16.     Defendant, APPLE STUDIOS, (hereafter "APPLE STUDIOS") is a wholly owned subsidiary of Defendant, APPLE PRODUCTIONS, INC.

17.     Defendant, JASON BECKNER, (hereafter "BECKNER") is an adult residing in the state of Kentucky.

18.     Defendant, JASON SEALS, (hereafter "SEALS") is an adult residing in the state of Arkansas.

19.     Defendant, CHASE SELBY, (hereafter "SELBY") is an adult residing in the state of Arkansas.

## FACTS COMMON TO ALL COUNTS

20.     Plaintiff, KELLY, is and was at all times relevant hereto, an adult female who began working for CTEH in May 2019.

21.     In July 2019, Plaintiff was selected by CTEH for "Level B" training, which qualified her to be selected for early mobilization, and she completed that training successfully.

22.     Beginning in August 2019, Plaintiff was assigned by CTEH to work in Rochester, New York as part of a mercury exposure response team and she completed that assignment successfully.

23.     Beginning in November 2019, Plaintiff was assigned by CTEH to work in Port Neches, Texas, as part of a team responding to a butadiene explosion, and she completed that assignment successfully on February 20, 2020.

24.     Following her work in Neches, Texas, Plaintiff was asked by CTEH whether she had a passport and would be willing to work as part of a Covid-19 response team in Japan; Plaintiff replied that she had a valid passport and wanted to work on the Japan assignment.

25.     CTEH assigned only men to work in Japan.

26.     In or about March 2020, CTEH was purchased, in its entirety, by Defendant, MONTROSE.

27.     In April 2020, Plaintiff was assigned by MONTROSE, through its subsidiary, CTEH, to take the lead on a Covid-19 screening assignment for a client, Lanxess, in Woodbridge, New Jersey, and she completed that project successfully in June 2020.

28.     While working with Lanxess, Plaintiff developed a positive relationship with that client, which resulted in the project being extended, to the benefit of MONTROSE and its subsidiary, CTEH.

29.    In August 2020, Plaintiff was assigned by MONTROSE, through its subsidiary, CTEH, to work on a school water damage project with a client, SRP, in Cedar Rapids, Iowa, which she completed successfully.

30.    During her assignment with SRP, Plaintiff worked with Brian Simpson of SRP, who complimented Plaintiff on her work for that company to MONTROSE, through its subsidiary, CTEH.

31.    Because of the favorable response by SRP to Plaintiff's work for them in Iowa, beginning in September 2020, Plaintiff was assigned by MONTROSE, through its subsidiary, CTEH, to work on another water damage project with SRP in Lake Charles, Louisiana.

32.    While working for MONTROSE, through its subsidiary, CTEH, in Lake Charles, Louisiana, Plaintiff was asked to take the lead on a Parish building project where she oversaw more than 25 MONTROSE and/or CTEH employees and liaised with the executive staff of client SRP.

33.    Plaintiff completed her work in Lake Charles, Louisiana successfully and received complimentary reviews from the SRP executive staff, to MONTROSE, through its subsidiary, CTEH.

34.    Later in September 2020, Plaintiff was assigned by MONTROSE, through its subsidiary, CTEH, to lead a moisture mapping project with client, ServePro, in Biloxi, Mississippi and Mobile, Alabama, when the project manager who had been working on that project was moved to a different project and specifically asked that Plaintiff take his place; Plaintiff completed that project successfully.

35.    In October 2020, Plaintiff was assigned by MONTROSE, through its subsidiary, CTEH, to oversee a moisture mapping project with a client, Phoenix Coatings, in Pensacola, Florida.

36.     During her work with Phoenix Coatings, Plaintiff was complimented by her supervisors at MONTROSE and CTEH, for her organizational skills and client skills, and MONTROSE created a company email account for Plaintiff.

37.     In October 2020, Plaintiff requested assignment to the Innovative Services division of MONTROSE, through its subsidiary, CTEH, which was involved in the production of television shows and feature films, based on prior experience she had in that industry.

38.     At all times relevant hereto, SELBY was the Vice President and Director of the Innovative Services division of MONTROSE, through its subsidiary, CTEH.

39.     On or about October 25, 2020, Plaintiff was assigned by MONTROSE, through its subsidiary, CTEH, to work as a Testing Coordinator on the production of the "Hightown" television show in Wilmington, North Carolina.

40.     Hightown is a television series produced by Defendants, LIONSGATE ENTERTAINMENT, through its subsidiary, LIONSGATE TELEVISION, and BRUCKHEIMER, through its subsidiaries, BRUCKHEIMER FILMS and BRUCKHEIMER TELEVISON.

41.     On October 20, 2020, MONTROSE, through its subsidiary, CTEH, paid Plaintiff $25.00 per hour while male Testing Coordinators working in the Innovative Services division were being paid up to $35.00 per hour.

42.     In October 2020, MONTROSE, through its subsidiary, CTEH, employed G. Guiotte as the Health and Safety Manager for the production of Hightown, and he was Plaintiff's immediate supervisor.

43.     In and prior to October 2020, MONTROSE through its subsidiary, CTEH, employed SEALS as the Health and Safety Supervisor for the production of Hightown, and he was Guiotte's immediate supervisor.

7

44.     On or about November 5, 2020, MONTROSE, through its subsidiary, CTEH, removed Guiotte as Health and Safety Manager for production of Hightown.

45.     On or about November 5, 2020, MONTROSE, through its subsidiary, CTEH, assigned the duties of the Assistant Health and Safety Manager for the Hightown production project to Plaintiff without increasing her pay, while male co-workers handling the same duties and responsibilities were paid considerably more than Plaintiff.

46.     During his time working on Hightown, SEALS was repeatedly drunk while on duty, and he repeatedly inquired of Plaintiff about the sexual orientation of his male co-workers, stating that he was looking for a "boyfriend."

47.     On or about November 1, 2020, a contract nurse, J. Etzkorn, who was employed by MONTROSE, through its subsidiary, CTEH, formally complained to the company's home office about SEALS being drunk on duty, drunk in public, drunk while interacting with clients during production of Hightown, and being unresponsive to positive Covid-19 tests due to alcohol impairment.

48.     On or about November 25, 2020, SEALS took photographs of Sullivan and commented to Plaintiff about how "sexy" Sullivan was to SEALS, which made Plaintiff feel uncomfortable in her workplace.

49.     During November and December 2020, SEALS became increasingly drunk and belligerent while on duty, including making harassing and inappropriate comments to Plaintiff and in her presence of a sexual nature and making drunken telephone calls to LIONSGATE TELEVISION executives Ami Cohen and Joel Meyer, and BRUCKHEIMER executives Jonathan Littman, KristieAnne Reed, Producer Ellen Schwartz, Show Creator Rebecca Cutter, Acot Monica Raymund, Actor Amaury Nolasco, UPM Dale Williams and Second AD Steven Lafferty.

8

50.     On or about December 15, 2020, Plaintiff spoke with SELBY to discuss Etzkorn's formal complaint about SEALS. SELBY advised that this was not the first time such complaints had been made against SEALS, and that SELBY would "monitor" the situation.

51.     During her conversation with SELBY on or about December 15, 2020, Plaintiff requested that her pay be increased to comport with the pay being given to her male co-workers performing the same duties and responsibilities. MONTROSE, through its subsidiary, CTEH, did not increase Plaintiff's wages.

52.     On or about December 25, 2020, Plaintiff again spoke with SELBY to discuss the ongoing drunkenness and belligerence of SEALS. Plaintiff was informed that SEALS was being promoted by MONTROSE, through its subsidiary, CTEH, and he would be transferred to the company's headquarters in Arkansas and given a raise.

53.     On or about January 4, 2021, SEALS sent Plaintiff a personal gift of $1,000.00 by Venmo with a message expressing his gratitude for all of the good things Plaintiff had done for MONTROSE, through its subsidiary, CTEH, while working on the production of Hightown.

54.     On or about January 4, 2021, SEALS sent Sullivan a personal gift of $1,000.00 by Cash App with a message stating it was for "sexual favors."

55.     SEALS' gift to Sullivan became known to Plaintiff, including the accompanying message, which made Plaintiff uncomfortable in the workplace.

56.     During January and February 2021, SEALS continued to be drunk and belligerent while on duty and during his interactions with employees of MONTROSE, through its subsidiary, CTEH, including Plaintiff, and with clients, and SEALS continued to make harassing and inappropriate comments to Plaintiff or in her presence of a sexual nature.

57.     By February 2021, SEALS' intoxication while at work had become so severe that he could not perform his job, including contract tracing, remembering conversations with cast and crew members, and returning telephone calls and emails; this behavior is witnessed by Plaintiff, Sullivan, other employees of MONTROSE and CTEH, along with agents and employees of LIONSGATE ENTERTAINMENT, LIONSGATE TELEVISION, BECKNER, BECKNER FILMS, and BECKNER TELEVISION.

58.     While working for MONTROSE, through its subsidiary, CTEH, on Hightown, SEALS became belligerent towards Plaintiff, and he made harassing and inappropriate comments to her of a sexual nature to Plaintiff or in her presence.

59.     SEALS' conduct toward Plaintiff was unwanted and unwarranted.

60.     SEALS persisted in his conduct toward Plaintiff despite being told it was offensive and being asked by Plaintiff to stop.

61.     SEALS' conduct toward Plaintiff was repeated, persistent, public, and done in the workplace, during working hours, and in the presence of other MONTROSE and CTEH employees and Hightown production personnel employed by LIONSGATE ENTERTAINMENT, LIONSGATE TELEVISION, BRUCKHEIMER, BRUCKHEIMER FILMS, and BRUCKHEIMER TELEVISION.

62.     CTEH, MONTROSE, LIONSGATE ENTERTAINMENT, LIONSGATE TELEVISION, BRUCKHEIMER, BRUCKHEIMER FILMS, and BRUCKHEIMER TELEVISION were each aware of SEALS' conduct toward Plaintiff as it was happening.

63.     CTEH, MONTROSE, LIONSGATE ENTERTAINMENT, LIONSGATE TELEVISION, BRUCKHEIMER, BRUCKHEIMER FILMS, and BRUCKHEIMER TELEVISION each had a duty to use reasonable care to safeguard the well-being of all people working on the

production of Hightown, including employees of its contractors and sub-contractors, including Plaintiff, by preventing SEALS' conduct toward Plaintiff through discipline and/or removal of him from the workplace.

64.     On or about February 13, 2021, Plaintiff spoke with SELBY to inform him about the situation with SEALS.

65.     During their conversation on or about February 13, 2021, SELBY requested that Plaintiff take over SEALS' job duties, including contact tracing and testing coordination of Hightown production staff and actors, effectively making Plaintiff the acting Health and Safety Supervisor, although her pay was unchanged and substantially less than that paid by MONTROSE, through its subsidiary, CTEH to male workers performing the same duties and responsibilities.

66.     During their conversation on or about February 13, 2021, Plaintiff reminded SELBY that she was still being paid at the rate of $25.00 per hour, and she demanded pay commensurate with her male counterparts, especially in light of her newly assigned responsibilities. MONTROSE, through its subsidiary, CTEH, did not increase Plaintiff's pay.

67.     Between February 15 and 16, 2021, the production of Hightown was placed on pause so that the entire case and crew could be tested for Covid-19.

68.     As requested by MONTROSE, through its subsidiary, CTEH, and SELBY, Plaintiff successfully managed and coordinated the Covid-19 testing of the cast and crew during the pause in production.

69.     On or about February 16, 2021, SEALS contacted Plaintiff and drunkenly abused and denigrated her for managing and coordinating the cast and crew testing and accused Plaintiff of attempting to steal his job.

11

70.     On or about February 18, 2021, Plaintiff formally complained to MONTROSE, through its Director of Human Resources, Jack Melvin, and to SELBY about SEALS' conduct toward Plaintiff.

71.     On or about February 19, 2021, MONTROSE, through its subsidiary, CTEH, advised Plaintiff that a new Health Safety Supervisor, BECKNER, would be replacing SEALS on the production of Hightown following SEALS' transfer to Arkansas.

72.     Following his transfer to Arkansas, SEALS continued to have supervisory authority over Plaintiff, and he continued to engage in a practice of hostile behavior against Plaintiff by making derogatory and uncomplimentary statements about Plaintiff to other employees and managers of MONTROSE and its subsidiary, CTEH.

73.     On or about February 25, 2021, BECKNER arrived in North Carolina to begin working on the production of Hightown.

74.     Following his arrival in North Carolina, BECKNER was required to quarantine for a period of time before he could be on set and interact with the cast and production staff.

75.     During BECKNER'S quarantine, Plaintiff performed the duties of Health and Safety Supervisor on the set of Hightown while still being paid $25.00 per hour.

76.     On or about March 1, 2021, BECKNER began working on the set of Hightown with Plaintiff.

77.     On or about March 2, 2021, BECKNER bean making inappropriate comments to Plaintiff of a sexual nature regarding her appearance, and her level of desirability to him.

78.     On or about March 2, 2021, BECKNER, began a pattern of inappropriate conduct toward Plaintiff, including throwing things between Plaintiff's breasts, touching Plaintiff's breasts, touching Plaintiff's buttocks, asking Plaintiff to dinner at fine dining establishments including

Nikki's Sushi and Ruth's Chris steakhouse in Wilmington, North Carolina, and attempting to intoxicate Plaintiff with alcohol for sexual purposes.

79.     On or about March 5, 2021, BECKNER asked Plaintiff to accompany him to a restaurant for drinks after working hours to discuss work, and Plaintiff agreed.

80.     On or about March 5, 2021, BECKNER attempted to kiss Plaintiff on multiple occasions and asked her to have sex with him. Plaintiff refused.

81.     During the early morning hours of March 6, 2021, BECKNER sent Plaintiff a text message asking for her hotel room number and stating that he was aroused and wanted to have sex with her. Plaintiff responded that BECKNER should go back to bed.

82.     On or about March 6, 2021, BECKNER gifted Plaintiff with a manicure and pedicure and then took her to dinner at Ruth's Chris followed by drinks at a local bar. During their conversation, BECKNER told Plaintiff about a feature film production in Georgia and stated that if things worked out between them, she could work on that production, which would entail a substantial raise in Plaintiff's status at MONTROSE, through its subsidiary, CTEH, and pay.

83.     During said night, BECKNER repeatedly purchased alcoholic beverages for Plaintiff and demanded that she drink them in an attempt to intoxicate her for sexual purposes.

84.     As a result of BECKNER'S plying Plaintiff with alcohol, Plaintiff became intoxicated and unable to make decisions regarding consent for sexual activity.

85.     On or about March 6, 2021, BECKNER accompanied Plaintiff back to her hotel room where he forcibly kissed Plaintiff and then engaged in aggressive sexual intercourse with Plaintiff.

86.     BECKNER'S conduct toward Plaintiff on the night of March 6, 2021, was unwanted and unwarranted.

87.     Between March 7 and 12, 2021, BECKNER sent Plaintiff repeated text messages making comments about having sex with her and discussing various places where he wanted to do that, which included locations on the job site and during working hours.

88.     On or about March 8, 2021, BECKNER asked Plaintiff whether she wanted to take a "Zoom meeting" under his desk, thereby implying that she should perform sex acts upon him, which made Plaintiff uncomfortable in the workplace.

89.     On or about March 8, 2021, BECKNER touched Plaintiff in a sexual manner on her buttocks and sent text messages to Plaintiff stating that he wanted to have sex with her.

90.     Between March 7 and 12, 2021, BECKNER had conversations with Plaintiff about her future with MONTROSE, through its subsidiary, CTEH, and BECKNER stated he could help Plaintiff get a "great position" on a movie production project.

91.     In March 2021, BECKNER knew that Plaintiff had children, that she was in the process of getting divorced, and that Plaintiff's husband was unemployed, making Plaintiff the sole earner of her household and financially dependent on her continued employment with MONTROSE, through its subsidiary, CTEH.

92.     On or about March 11, 2021, BECKNER met Plaintiff in the lobby bar of her hotel and again discussed her future with MONTROSE, through its subsidiary, CTEH, including the things he could do for her at the company to increase her pay and status with the company.

93.     During their discussion in the hotel lobby bar, BECKNER repeatedly purchased alcoholic beverages for Plaintiff's consumption and demanded that she drink them in an attempt to intoxicate her for sexual purposes.

94.     As a result of BECKNER'S plying Plaintiff with alcohol, Plaintiff became intoxicated and unable to consent for sexual activity.

14

95.     On or about March 11, 2021, BECKER took Plaintiff to his hotel room where he engaged in sexual intercourse with her.

96.     BECKNER'S conduct toward Plaintiff on the night of March 11, 2021, was unwanted and unwarranted.

97.     On or about March 12, 2021, BECKNER advised Plaintiff that he knew what her next assignment at MONTROSE, through its subsidiary, CTEH, would be, suggested that it would be a promotion to a feature film production with a significant pay raise, but BECKNER refused to tell Plaintiff exactly what her next assignment would be.

98.     On or about March 16, 2021, BECKNER met Plaintiff in a parking lot and requested that she leave work with him to have sex. Plaintiff refused.

99.     On or about March 17, 2021, BECKNER advised Plaintiff that he was able to get SELBY and MONTROSE, through its subsidiary, CTEH, to approve her to work on the production of the feature film "Sacred Motivation" a/k/a "Emancipation," as a Health and Safety Manager, which was being produced Savanah, Georgia,

100.    On or about March 17, 2021, BECKNER told Plaintiff that he would be working on Emancipation, and that he wanted her to accept that assignment.

101.    On or about March 17, 2021, BECKNER advised Plaintiff that MONTROSE, through its subsidiary, CTEH, was willing to pay Plaintiff $40.00 to be the Health and Safety Manager on the production of Emancipation, which was an increase from her then current pay rate of $25.00 per hour if she agreed to accept the assignment to work on Emancipation.

102.    On or about March 17, 2021, MONTROSE, through its subsidiary, CTEH, paid male Health and Safety Managers working on feature film production a minimum of $75.00 per hour, and Plaintiff requested equal pay.

15

103.    On or about March 17, 2021, Plaintiff protested to BECKNER that $40.00 per hours was significantly less than male co-workers at MONTROSE and its subsidiary, CTEH, were paid to perform the same job title, duties and responsibilities, and Plaintiff demanded equal pay.

104.    On or about March 17, 2021, BECKNER told Plaintiff that MONTROSE, through its subsidiary, CTEH, was not willing to pay her more than $60.00 per hour to perform the work of Health and Safety Manager on the production of the feature film, Emancipation. Despite this violation of the Equal Pay Act of 1963, 29 U.S.C. 206(d), Plaintiff felt she had no choice but to accept that position at $60.00 per hour or face unemployment and the inability to support her family.

105.    Plaintiff was told by BECKNER, SELBY, and others working for MONTROSE, through its subsidiary, CTEH, that her promotion was based on merit and her ability to fill in for SEALS during the production of Hightown and her ability to manage, coordinate and accomplish Covid-19 testing of the entire cast and crew of Hightown over a two-day period thereby avoiding an undue delay in production.

106.    During the evening of March 17, 2021, BECKNER knocked on Plaintiff's hotel room door while she was taking a shower.

107.    Thinking BECKNER wanted to discuss Plaintiff's new assignment working on Emancipation, Plaintiff left the shower, put on a robe, and opened the door of her hotel room for BECKNER.

108.    Upon seeing Plaintiff in a bathrobe, BECKNER forced his way into Plaintiff's hotel room, forcefully kissed Plaintiff, physically forced plaintiff into the bedroom area of her hotel room, removed his pants, forced Plaintiff to her knees, forcibly inserted his erect penis into Plaintiff's mouth, threw Plaintiff onto the bed of her hotel room face down, and forcefully inserted his erect penis into Plaintiff's anus until he climaxed.

16

109.    At all times during the above, Plaintiff never gave consent for any of BECKNER'S activities.

110.    BECKNER'S conduct toward Plaintiff on the night of March 17, 2021, was unwanted and unwarranted.

111.    Upon completing the above, BECKNER told Plaintiff: "Now that we've got that out of the way, see you at dinner." Plaintiff responded by explicitly and unequivocally telling BECKNER to never touch her again.

112.    On or about March 18, 2021, BECKNER left North Carolina to begin working for MONTROSE, through its subsidiary, CTEH, as the Health and Safety Supervisor for the production of Emancipation in Georgia.

113.    Before leaving North Carolina, BECKNER met Plaintiff in a parking lot, apologized for his actions, and repeated his desire that she follow him across state lines from North Carolina to Georgia to work under him as the Health and Safety Manager for MONTROSE, through its subsidiary, CTEH, on the production of Emancipation with a promise that he could "behave."

114.    After leaving North Carolina, BECKNER sent Plaintiff several messages acknowledging what he did to Plaintiff there was wrong and repeated his promise such conduct would not occur again.

115.    Production of Hightown wrapped up in late March 2021.

116.    On or about April 18, 2021, Plaintiff left North Carolina and moved to Savanah, Georgia to work on the production of Emancipation.

117.    On or about April 18, 2021, Plaintiff learned that APPLE, APPLE PRODUCTIONS, and APPLE STUDIOS decided to transfer the production of Emancipation from Savanah, Georgia to New Orleans, Louisiana.

118.   On or about April 24, 2021, Plaintiff arrived in New Orleans, Louisiana to begin her assignment with MONTROSE, through its subsidiary, CTEH, as the Health and Safety Manager for the production of Emancipation.

119.   On or about April 24, 2021, around 9:30 p.m., Plaintiff arrived at her hotel room in New Orleans, Louisiana to find BECKNER waiting for her at the front desk.

120.   Upon seeing Plaintiff enter the hotel lobby, BECKNER approached Plaintiff, attempted to force himself on her, touched her in a sexually inappropriate manner, grabbed her buttocks, and attempted to kiss her.

121.   Plaintiff rejected BECKNER'S advances in the lobby of her hotel room both orally and by physically moving his hands away from her person.

122.   Following Plaintiff's rejection in the lobby of her hotel room, BECKNER offered cash to Plaintiff by forcibly placing the bills into her brassiere and touching her breasts.

123.   On or about May 2, 2021, Plaintiff was approached by MONTROSE and CTEH employee, Jessica Cook, who was working on the production of Emancipation as a Testing Coordinator, about issues she was having with BECKNER.

124.   Plaintiff confided in Cook about her own issues involving BECKNER, and Plaintiff shared some of BECKNER'S sexually inappropriate text messages with Cook.

125.   On or about May 3, 2021, BECKER met with Plaintiff and again attempted to put $500 in cash into Plaintiff's brassiere and touch her breasts.

126.   On or about May 10, 2021, BECKNER sent a text message to Plaintiff suggesting that they "go upstairs" for sex. Plaintiff declined.

127.   Throughout the month of May 2021, BECKNER made repeated overtures toward Plaintiff to have sex with him, and Plaintiff rejected all of them.

18

128.   On or about May 21, 2021, following the filing by Cook of a formal complaint at MONTOSE'S headquarters in Arkansas against BECKNER, which included disclosure of the inappropriate text messages BECKNER sent to Plaintiff, MONTROSE, through its subsidiary, CTEH, removed Cook from working on the production of Emancipation.

129.   During the first week of June 2021, BECKER advised Plaintiff that he had "finally given up" trying to have sex with her and implied that he would act to have Plaintiff terminated with MONTROSE and CTEH.

130.   During the first week of June 2021, BECKNER began to criticize Plaintiff's work and managerial style for the first time after having previously praised Plaintiff for exactly those same things.

131.   Also beginning around the first week of June 2021, the Testing Coordinators at MONTROSE through its subsidiary, CTEH, ceased communication with Plaintiff, making it extremely difficult for her to perform her job.

132.   Plaintiff confronted BECKNER with the fact that the Testing Coordinators were not communicating with Plaintiff, but BECKNER refused to support Plaintiff or intervene on her behalf.

133.   On or about June 16, 2021, SELBY, who works from MONTROSE'S headquarters in Arkansas, flew to New Orleans and had a personal meeting with BECKNER.

134.   On or about June 18, 2021, and despite her fears of retaliation and/or discharge, Plaintiff attempted to formally report BECKNER'S conduct to SELBY and demand that he and MONTROSE, through its subsidiary, CTEH, take remedial action to address it, by requesting a meeting with SELBY.

135.   On or about June 18, 2021, and despite her fears of retaliation and/or discharge, Plaintiff attempted to formally demand equal pay commensurate with her male co-workers

performing the duties and responsibilities of a Health and Safety Manager on the production of a feature film, by requesting a meeting with SELBY.

136.    On or about June 18, 2021, SELBY refused to meet with Plaintiff, refused to take any remedial action against BECKNER, refused to increase Plaintiff's pay to comport with that being paid to her male counterparts performing the same job title, duties and responsibilities, and threatened Plaintiff with job termination if she escalated her complaints above him.

137.    On or about June 19, 2021, Plaintiff's access to MONTROSE and CTEH, email and intranet services was cut off.

138.    On or about June 21, 2021, Plaintiff was informed by Jack Melvin, MONTROSE's Director of Human Resources at its subsidiary, CTEH, that Plaintiff was being removed from the production of Emancipation, and that Plaintiff was being demoted from Health and Services Manager to Rapid Responder with a corresponding reduction in pay.

139.    During her conversation with Jack Melvin, he advised Plaintiff that neither MONTROSE nor its subsidiary, CTEH, had any work available for a Rapid Responder, Plaintiff's position with the company was not guaranteed, and that she should consider herself as an unpaid, "on call" worker.

140.    On June 21, 2021, Melvin, at the insistence and orchestration of SEALS, SELBY and BECKNER, Plaintiff's employment was terminated with MONTROSE and its subsidiary, CTEH.

141.    During her conversation with Jack Melvin, Plaintiff protested that she had successfully completed all of her job duties and MONTROSE and CTEH'S clients were happy with her. Melvin acknowledged the truth of both claims.

142.    During her conversation with Jack Melvin, Plaintiff requested a statement from MONTROSE, through its subsidiary, CTEH, outlining why she was being removed from employment with the company, but the company refused to provide any such statement.

143.    SELBY'S job duties, as Vice President and Director of Innovative Services at MONTROSE, through its subsidiary, CTEH, included using reasonable care to safeguard the well-being of the employees he supervised, including Plaintiff when she worked on the productions of Hightown and Emancipation.

144.    BECKNER'S job duties, as Health and Safety Supervisor at MONTROSE, through its subsidiary, CTEH, during the production of Hightown and Emancipation, included using reasonable care to safeguard the well-being of the employees he supervised, including Plaintiff.

145.    BECKNER'S communications with Plaintiff between March and June 2021 made it clear to her that her future with MONTROSE, and CTEH, was dependent upon her relationship with BECKNER and his satisfaction with same.

146.    During her time in North Carolina, SEALS was Plaintiff's supervisor while he held the position of Health and Safety Supervisor for the Innovative Services division of MONTROSE, through its subsidiary, CTEH.

147.    SEALS' job duties included using reasonable care to safeguard the well-being of his co-workers, including Plaintiff, by abstaining in inappropriate conduct involving sexual harassment.

148.    After her promotion from Testing Coordinator to Health and Services Manager on or about March 17, 2021, Plaintiff continued to be supervised by BECKNER, who was MONOTROSE and CTEH'S Health and Safety Supervisor, and SELBY, who continued to be MONTROSE'S Vice President and Director of Innovative Services for its subsidiary, CTEH.

149.    Following her promotion on March 17, 2021, Plaintiff was not paid at a rate commensurate with that of her male co-workers performing the same job, and she was, in fact, paid significantly less than her male co-workers performing the same job duties and responsibilities.

150.    Following her promotion on March 17, 2021, Plaintiff requested equal pay from MONTROSE and CTEH through SELBY and BECKNER.

151.    Plaintiff's requests for equal pay were rejected.

152.    Beginning during her work on Hightown in North Carolina and continuing to her next assignment at in New Orleans, Louisiana, BECKNER began making harassing and inappropriate comments of a sexual nature to Plaintiff.

153.    BECKNER'S conduct toward Plaintiff constituted an ongoing and continuous pattern and practice or sexual grooming, sexual intimidation, employment intimidation, financial intimidation, and unwanted sexual battery that began in North Carolina and continued after plaintiff's assignment by MONTROSE, through its subsidiary, CTEH, to New Orleans, Louisiana.

154.    As part of his ongoing and continuous pattern and practice of grooming and intimidating Plaintiff, BECKNER, was sexually flirtatious with Plaintiff, referred to Plaintiff as someone who was "special" to him, took plaintiff to dinner at expensive restaurants, repeatedly told Plaintiff through text messages and orally that he desired to have sex with Plaintiff, bought alcoholic beverages for Plaintiff's consumption in an attempt to intoxicate her for sexual purposes, threatened Plaintiff that her job security and her future with MONTROSE and CTEH was dependent upon her relationship with him and his satisfaction with same, forcefully kissed plaintiff against her will, forcefully touched Plaintiff in a sexual manner against her will, and forcefully engaged in sexual intercourse with Plaintiff against her will on multiple occasions.

155.    BECKNER'S conduct toward Plaintiff was unwanted and unwarranted.

22

156.    BECKNER persisted in his conduct toward Plaintiff despite being told it was offensive and being asked by Plaintiff to stop.

157.    Other than the episodes of sexual intercourse, BECKNER'S conduct toward Plaintiff was done in public, on the job site, during working hours, and in the presence of other CTEH/MONTROSE employees and Hightown production personnel employed by LIONSGATE ENTERTAINMENT, LIONSGATE TELEVISION, BRUCKHEIMER, BRUCKHEIMER FILMS, and BRUCKHEIMER TELEVISION.

158.    CTEH, MONTROSE, LIONSGATE ENTERTAINMENT, LIONSGATE TELEVISION, BRUCKHEIMER, BRUCKHEIMER FILMS, and BRUCKHEIMER TELEVISION were each aware of BECKNER'S conduct toward Plaintiff as it was happening.

159.    CTEH, MONTROSE, LIONSGATE ENTERTAINMENT, LIONSGATE TELEVISION, BRUCKHEIMER, BRUCKHEIMER FILMS, and BRUCKHEIMER TELEVISION each had a duty to use reasonable care to safeguard the well-being of all people working on the production of Hightown, including employees of its contractors and sub-contractors, including Plaintiff, by preventing BECKNER'S conduct toward Plaintiff through discipline and/or removal of him from the workplace

160.    Defendants, CTEH, MONTROSE, LIONSGATE ENTERTAINMENT, LIONSGATE TELEVISION, BECKNER, BECKNER FILMS, and BECKNER TELEVISION each had the authority to control all aspects of production on Hightown, including the ability to control the method and manner of Plaintiff's job responsibilities, Plaintiff's hours of work, which employees and other personnel were assigned to work with Plaintiff, and the authority to censure, reprimand, and remove employees of MONTROSE and CTEH from the jobsite.

161.    When production of Hightown ended in North Carolina, BECKNER, used his position at MONTROSE, through its subsidiary, CTEH, to arrange for Plaintiff and himself to be re-assigned to the production of the feature film Emancipation in New Orleans, Louisiana.

162.    BECKNER intimidated and coerced Plaintiff into accepting the transfer by threatening that if she refused to follow him there, her career at MONTROSE and CTEH could be adversely impacted and/or terminated.

163.    After Plaintiff accepted the assignment to continue her employment with MONTROSE, through its subsidiary, CTEH, to work on the production of Emancipation in New Orleans, Louisiana, BECKNER continued his ongoing and continuous pattern and practice of sexual grooming, sexual intimidation, employment intimidation, financial intimidation, and unwanted sexual battery against Plaintiff.

164.    Emancipation is a feature film produced by Defendants, APPLE, INC., APPLE STUDIOS and APPLE PRODUCTIONS.

165.    As part of his ongoing and continuous pattern and practice of grooming and intimidating Plaintiff, and after Plaintiff moved to Louisiana to work on Emancipation, BECKNER, continued to be sexually flirtatious with Plaintiff, referred to Plaintiff as someone who was "special" to him, repeatedly told Plaintiff through text messages and orally that he desired to have sex with Plaintiff, offered to purchase alcoholic beverages for Plaintiff's consumption in an attempt to intoxicate her for sexual purposes, threatened Plaintiff that her job security and her future with MONTROSE and CTEH was dependent upon her relationship with him and his satisfaction with same, forcefully kissed plaintiff against her will, and forcefully touched Plaintiff in a sexual manner against her will.

166.    BECKNER'S conduct toward Plaintiff in Louisiana continued to be unwanted and unwarranted by Plaintiff.

167.    BECKNER persisted in his conduct toward Plaintiff in Louisiana despite being told it was offensive and being asked by Plaintiff to stop.

168.    BECKNER'S conduct toward Plaintiff in Louisiana was done in public, on the job site, during working hours, and in the presence of other MONTROSE and CTEH employees as well as Emancipation production personnel employed by APPLE, INC., APPLE STUDIOS, and APPLE PRODUCTIONS.

169.    CTEH, MONTROSE, APPLE, INC., APPLE STUDIOS, and APPLE PRODUCITONS were each aware of BECKNER'S conduct toward Plaintiff as it was happening.

170.    Defendants, CTEH, MONTROSE, APPLE, INC., APPLE STUDIOS, and APPLE PRODUCTIONS each had the authority to control all aspects of production on Emancipation, including the ability to control the method and manner of Plaintiff's job responsibilities, Plaintiff's hours of work, which employees and other personnel were assigned to work with Plaintiff, and the authority to censure, reprimand, and remove employees of MONTROSE and CTEH from the jobsite.

171.    CTEH, MONTROSE, APPLE, INC., APPLE STUDIOS, and APPLE PRODUCTIONS each had a duty to use reasonable care to safeguard the well-being of all people working on the production of Emancipation, including employees of its contractors and sub-contractors, including Plaintiff, by preventing BECKNER'S conduct toward Plaintiff through discipline and/or removal of him from the workplace.

172.    On or about June 19, 2021, MONTROSE, through its subsidiary, CTEH. demoted Plaintiff in job position, title, and pay after Plaintiff made it clear that she was unwilling to engage in a sexual relationship with BECKNER, and in retaliation for that decision.

25

173.    On or about June 21, 2021, MONTROSE, through its subsidiary, CTEH, effectively terminated Plaintiff's employment with the company in retaliation for Plaintiff's refusal to engage in a sexual relationship with BECKNER.

174.    At all times relevant to this matter, MONTROSE, through its subsidiary, CTEH, cultivated, fostered, and encouraged an environment in its Innovative Services division, which was condoned and actively managed by SELBY, for management personnel to use their positions of power, wealth, and authority to pray upon younger employees for sexual gratification while working on site during productions of television shows and feature films, including the promotion of those younger workers who were willing to participate in such behavior and the termination of those who were not.

175.    At all times relevant to this matter, MONTROSE, through its subsidiary, CTEH, cultivated, fostered, and encouraged an environment in its Innovative Services division, which was condoned and actively managed by SELBY, whereby male workers were paid disproportionately more than female workers performing the same jobs, job titles, and job responsibilities.

## COUNT I - NEGLIGENT SUPERVISION
## DIRECTED AT DEFENDANT CTEH

176.    Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

177.    At all relevant times, CTEH had a duty to exercise reasonable care in the supervision of its agents and/or employees, including SEALS, SELBY and BECKNER.

178.    At all times relevant, CTEH had a duty to supervise and protect its employees, including Plaintiff, against unwanted belligerent and harassing behavior on the jobsite, including the making of harassing and inappropriate comments of a sexual nature, such as

perpetrated upon Plaintiff by SEALS.

179.    At all times relevant, CTEH had a duty to supervise and protect its employees, including Plaintiff, against sexual grooming, sexual intimidation, employment intimidation, and unwanted sexual battery, such as perpetrated upon Plaintiff by BECKNER.

180.    At all times relevant, CTEH had the authority to take action to prevent, protect, and/or intervene when it learned that its employees were at risk of harm and/or being victimized by belligerent and harassing behavior, sexual grooming, sexual intimidation, employment intimidation, and sexual battery.

181.    At all times relevant, CTEH knew, or in the exercise of ordinary care should have known, that SEALS was engaging in belligerent and sexually harassing behavior toward Plaintiff.

182.    At all times relevant, CTEH knew, or in the exercise of ordinary care should have known, that BECKNER was engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff.

183.    In violation of its duties as aforesaid, CTEH committed one or more of the following acts or omissions:

> (a)    Failed to supervise SEALS and prevent him engaging in belligerent and sexually harassing behavior toward Plaintiff;
>
> (b)    Failed to supervise BECKNER and prevent him from engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff;
>
> (c)    Disregarded the continuous and ongoing risk of harm that SEALS and BECKNER posed to Plaintiff's well-being and safety;
>
> (d)    Failed to protect Plaintiff from the reasonably foreseeable threat posed by SEALS and BECKNER;

(e)    Fostered a workplace environment where belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery were allowed against female workers; and

(f)    Failed to take action against its employees, including SEALS and BECKNER, when it knew or reasonably should have known interventional action was necessary to address and prevent their behavior of engaging in belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery against Plaintiff;

184.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions by CTEH, Plaintiff was caused to sustained severe, permanent physical, mental, and emotional injuries; Plaintiff continues and will in the future continue to suffer great pain and mental anguish; Plaintiff was, and will in the future be, unable to attend to her usual affairs, duties, and occupation; Plaintiff has been, and in the future will be required to incur expenses for medical and psychological treatment arising from her injuries; and the Plaintiff was otherwise injured or damaged.

## COUNT II - NEGLIGENT SUPERVISION
## DIRECTED AT DEFENDANT MONTROSE

185.    Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

186.    At all relevant times, MONTROSE had a duty to exercise reasonable care in the supervision of its agents and/or employees, including SEALS, SELBY and BECKNER.

187.    At all times relevant, MONTROSE had a duty to supervise and protect its employees, including Plaintiff, against unwanted belligerent and harassing behavior on the jobsite, including the making of harassing and inappropriate comments of a sexual nature, such as

perpetrated upon Plaintiff by SEALS.

188.    At all times relevant, MONTROSE had a duty to supervise and protect its employees, including Plaintiff, against sexual grooming, sexual intimidation, employment intimidation, and unwanted sexual battery, such as perpetrated upon Plaintiff by BECKNER.

189.    At all times relevant, MONTROSE had the authority to take action to prevent, protect, and/or intervene when it learned that its employees were at risk of harm and/or being victimized by belligerent and harassing behavior, sexual grooming, sexual intimidation, employment intimidation, and sexual battery.

190.    At all times relevant, MONTROSE knew, or in the exercise of ordinary care should have known, that SEALS was engaging in belligerent and sexually harassing behavior toward Plaintiff.

191.    At all times relevant, MONTROSE knew, or in the exercise of ordinary care should have known, that BECKNER was engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff.

192.    In violation of its duties as aforesaid, MONTROSE committed one or more of the following acts or omissions:

> (a)    Failed to supervise SEALS and prevent him engaging in belligerent and sexually harassing behavior toward Plaintiff;
>
> (b)    Failed to supervise BECKNER and prevent him from engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff;
>
> (c)    Disregarded the continuous and ongoing risk of harm that SEALS and BECKNER posed to Plaintiff's well-being and safety;
>
> (d)    Failed to protect Plaintiff from the reasonably foreseeable threat posed by SEALS and BECKNER;

(e)    Fostered a workplace environment where belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery were allowed against female workers; and

(f)    Failed to take action against its employees, including SEALS and BECKNER, when it knew or reasonably should have known interventional action was necessary to address and prevent their behavior of engaging in belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery against Plaintiff;

193.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions by MONTROSE, Plaintiff was caused to sustained severe, permanent physical, mental, and emotional injuries; Plaintiff continues and will in the future continue to suffer great pain and mental anguish; Plaintiff was, and will in the future be, unable to attend to her usual affairs, duties, and occupation; Plaintiff has been, and in the future will be required to incur expenses for medical and psychological treatment arising from her injuries; and the Plaintiff was otherwise injured or damaged.

**WHEREFORE**, Plaintiff, ALICIA KELLY, prays for judgment against Defendant MONTROSE in an amount in excess of $75,000.00, plus the costs of this lawsuit.

### COUNT III - NEGLIGENT SUPERVISION
### DIRECTED AT DEFENDANT SELBY

194.    Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

195.    At all relevant times, SELBY had a duty to exercise reasonable care in the supervision of the agents and/or employees of CTEH under his direct supervision and authority, including SEALS and BECKNER.

196.    At all times relevant, SELBY had a duty to supervise and protect the

employees of MONTROSE and its subsidiary, CTEH, under his direct supervision, including Plaintiff, against unwanted belligerent and harassing behavior on the jobsite, including the making of harassing and inappropriate comments of a sexual nature, such as perpetrated upon Plaintiff by SEALS.

197.   At all times relevant, MONTROSE had a duty to supervise and protect the employees of MONTROSE and its subsidiary, CTEH, under his direct supervision, including Plaintiff, against sexual grooming, sexual intimidation, employment intimidation, and unwanted sexual battery, such as perpetrated upon Plaintiff by BECKNER.

198.   At all times relevant, SLEBY had the authority to take action to prevent, protect, and/or intervene when he learned that employees of MONTROSE and/or CTEH were at risk of harm and/or being victimized by belligerent and harassing behavior, sexual grooming, sexual intimidation, employment intimidation, and sexual battery.

199.   At all times relevant, SELBY knew, or in the exercise of ordinary care should have known, that SEALS was engaging in belligerent and sexually harassing behavior toward Plaintiff.

200.   At all times relevant, SELBY knew, or in the exercise of ordinary care should have known, that BECKNER was engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff.

201.   In violation of its duties as aforesaid, SELBY committed one or more of the following acts or omissions:

     (a)    Failed to supervise SEALS and prevent him engaging in belligerent and sexually harassing behavior toward Plaintiff;

     (b)    Failed to supervise BECKNER and prevent him from engaging in activities of sexual grooming, sexual intimidation, employment intimidation,

and sexual battery toward Plaintiff;

(c)    Disregarded the continuous and ongoing risk of harm that SEALS and BECKNER posed to Plaintiff's well-being and safety;

(d)    Failed to protect Plaintiff from the reasonably foreseeable threat posed by SEALS and BECKNER;

(e)    Fostered a workplace environment where belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery were allowed against female workers; and

(f)    Failed to take action against employees of MONTROSE and/or CTEH under his direct supervision, including SEALS and BECKNER, when he knew or reasonably should have known interventional action was necessary to address and prevent their behavior of engaging in belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery against Plaintiff;

202.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions by SELBY, Plaintiff was caused to sustained severe, permanent physical, mental, and emotional injuries; Plaintiff continues and will in the future continue to suffer great pain and mental anguish; Plaintiff was, and will in the future be, unable to attend to her usual affairs, duties, and occupation; Plaintiff has been, and in the future will be required to incur expenses for medical and psychological treatment arising from her injuries; and the Plaintiff was otherwise injured or damaged.

## COUNT IV - NEGLIGENT SUPERVISION
## DIRECTED AT LIONSGATE ENTERTAINMENT

203.    Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

204.    At all relevant times, LIONSGATE ENTERTAINMENT had a duty to exercise reasonable care in the supervision of its subsidiaries, contractors, sub-contractors, and their

employees working on the production of the Hightown television show in Wilmington, North Carolina.

205.   At all times relevant, LIONSGATE ENTERTAINMENT had a duty to supervise and protect the employees of its contractors and sub-contractors, including the employees of MONTROSE and CTEH who were under LIONSGATE ENTERTAINMENT'S direct supervision and control, including Plaintiff, against unwanted belligerent and harassing behavior on the jobsite, including the making of harassing and inappropriate comments of a sexual nature, such as perpetrated upon Plaintiff by SEALS.

206.   At all times relevant, LIONSGATE ENTERTAINMENT had a duty to supervise and protect the employees of its contractors and sub-contractors, including the employees of MONTROSE and CTEH who were under LIONSGATE ENTERTAINMENT'S direct supervision and control, including Plaintiff, against sexual grooming, sexual intimidation, employment intimidation, and unwanted sexual battery, such as perpetrated upon Plaintiff by BECKNER.

207.   At all times relevant, LIONSGATE ENTERTAINMENT had the authority to take action to prevent, protect, and/or intervene when it learned that employees of MONTROSE and/or CTEH under its direct supervision and control were at risk of harm and/or being victimized by belligerent and harassing behavior, sexual grooming, sexual intimidation, employment intimidation, and sexual battery.

208.   At all times relevant, LIONSGATE ENTERTAINMENT knew, or in the exercise of ordinary care should have known, that SEALS was engaging in belligerent and sexually harassing behavior toward Plaintiff.

209.   At all times relevant, LIONSGATE ENTERTAINMENT knew, or in the

33

exercise of ordinary care should have known, that BECKNER was engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff.

210.    In violation of its duties as aforesaid, LIONSGATE ENTERTAINMENT committed one or more of the following acts or omissions:

(a)    Failed to supervise SEALS and prevent him engaging in belligerent and sexually harassing behavior toward Plaintiff;

(b)    Failed to supervise BECKNER and prevent him from engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff;

(c)    Disregarded the continuous and ongoing risk of harm that SEALS and BECKNER posed to Plaintiff's well-being and safety;

(d)    Failed to protect Plaintiff from the reasonably foreseeable threat posed by SEALS and BECKNER;

(e)    Fostered a workplace environment where belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery were allowed against female workers; and

(f)    Failed to take action against MONTROSE and/or CTEH or any of their employees, which were under LIONSGATE ENTERTAINMENT'S direct supervision and control, including SEALS and BECKNER, when it knew or reasonably should have known interventional action was necessary to address and prevent their behavior of engaging in belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery against Plaintiff;

211.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions by LIONSGATE ENTERTAINMENT, Plaintiff was caused to sustained severe, permanent physical, mental, and emotional injuries; Plaintiff continues and will in the future continue to suffer great pain and mental anguish; Plaintiff was, and will in the future be, unable to attend to her usual affairs, duties, and occupation; Plaintiff has been,

and in the future will be required to incur expenses for medical and psychological treatment arising from her injuries; and the Plaintiff was otherwise injured or damaged.

## <u>COUNT V - NEGLIGENT SUPERVISION</u><br><u>DIRECTED AT LIONSGATE TELEVISION</u>

212.    Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

213.    At all relevant times, LIONSGATE TELEVISION had a duty to exercise reasonable care in the supervision of its subsidiaries, contractors, sub-contractors, and their employees working on the production of the Hightown television show in Wilmington, North Carolina.

214.    At all times relevant, LIONSGATE TELEVISION had a duty to supervise and protect the employees of its contractors and sub-contractors, including the employees of MONTROSE and CTEH who were under LIONSGATE TELEVISION'S direct supervision and control, including Plaintiff, against unwanted belligerent and harassing behavior on the jobsite, including the making of harassing and inappropriate comments of a sexual nature, such as perpetrated upon Plaintiff by SEALS.

215.    At all times relevant, LIONSGATE TELEVISION had a duty to supervise and protect the employees of its contractors and sub-contractors, including the employees of MONTROSE and CTEH who were under LIONSGATE TELEVISION'S direct supervision and control, including Plaintiff, against sexual grooming, sexual intimidation, employment intimidation, and unwanted sexual battery, such as perpetrated upon Plaintiff by BECKNER.

216.    At all times relevant, LIONSGATE TELEVISION had the authority to take action to prevent, protect, and/or intervene when it learned that employees of MONTROSE

and/or CTEH under its direct supervision and control were at risk of harm and/or being victimized by belligerent and harassing behavior, sexual grooming, sexual intimidation, employment intimidation, and sexual battery.

217.    At all times relevant, LIONSGATE TELEVISION knew, or in the exercise of ordinary care should have known, that SEALS was engaging in belligerent and sexually harassing behavior toward Plaintiff.

218.    At all times relevant, LIONSGATE TELEVISION knew, or in the exercise of ordinary care should have known, that BECKNER was engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff.

219.    In violation of its duties as aforesaid, LIONSGATE TELEVISION committed one or more of the following acts or omissions:

(a)    Failed to supervise SEALS and prevent him engaging in belligerent and sexually harassing behavior toward Plaintiff;

(b)    Failed to supervise BECKNER and prevent him from engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff;

(c)    Disregarded the continuous and ongoing risk of harm that SEALS and BECKNER posed to Plaintiff's well-being and safety;

(d)    Failed to protect Plaintiff from the reasonably foreseeable threat posed by SEALS and BECKNER;

(e)    Fostered a workplace environment where belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery were allowed against female workers; and

(f)    Failed to take action against MONTROSE and/or CTEH or any of their employees, which were under LIONSGATE TELEVISION'S direct supervision and control, including SEALS and BECKNER, when it knew or reasonably should have known interventional action was necessary to address and prevent their behavior of engaging in

belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery against Plaintiff;

220.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions by LIONSGATE TELEVISION, Plaintiff was caused to sustained severe, permanent physical, mental, and emotional injuries; Plaintiff continues and will in the future continue to suffer great pain and mental anguish; Plaintiff was, and will in the future be, unable to attend to her usual affairs, duties, and occupation; Plaintiff has been, and in the future will be required to incur expenses for medical and psychological treatment arising from her injuries; and the Plaintiff was otherwise injured or damaged.

## COUNT VI - NEGLIGENT SUPERVISION
## DIRECTED AT BRUCKHEIMER

221.    Plaintiff incorporates by reference Paragraphs 1 through 70 of this Complaint as if fully set forth herein.

222.    At all relevant times, BRUCKHEIMER had a duty to exercise reasonable care in the supervision of its subsidiaries, contractors, sub-contractors, and their employees working on the production of the Hightown television show in Wilmington, North Carolina.

223.    At all times relevant, BRUCKHEIMER had a duty to supervise and protect the employees of its contractors and sub-contractors, including the employees of MONTROSE and CTEH who were under BRUCKHEIMER'S direct supervision and control, including Plaintiff, against unwanted belligerent and harassing behavior on the jobsite, including the making of harassing and inappropriate comments of a sexual nature, such as perpetrated upon Plaintiff by SEALS.

224.    At all times relevant, BRUCKHEIMER had a duty to supervise and protect the

employees of its contractors and sub-contractors, including the employees of MONTROSE and CTEH who were under BRUCKHEIMER'S direct supervision and control, including Plaintiff, against sexual grooming, sexual intimidation, employment intimidation, and unwanted sexual battery, such as perpetrated upon Plaintiff by BECKNER.

225.    At all times relevant, BRUCKHEIMER had the authority to take action to prevent, protect, and/or intervene when it learned that employees of MONTROSE and CTEH under its direct supervision and control were at risk of harm and/or being victimized by belligerent and harassing behavior, sexual grooming, sexual intimidation, employment intimidation, and sexual battery.

226.    At all times relevant, BRUCKHEIMER knew, or in the exercise of ordinary care should have known, that SEALS was engaging in belligerent and sexually harassing behavior toward Plaintiff.

227.    At all times relevant, BRUCKHEIMER knew, or in the exercise of ordinary care should have known, that BECKNER was engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff.

228.    In violation of its duties as aforesaid, BRUCKHEIMER committed one or more of the following acts or omissions:

(a)    Failed to supervise SEALS and prevent him engaging in belligerent and sexually harassing behavior toward Plaintiff;

(b)    Failed to supervise BECKNER and prevent him from engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff;

(c)    Disregarded the continuous and ongoing risk of harm that SEALS and BECKNER posed to Plaintiff's well-being and safety;

(d)    Failed to protect Plaintiff from the reasonably foreseeable threat posed

by SEALS and BECKNER;

(e)    Fostered a workplace environment where belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery were allowed against female workers; and

(f)    Failed to take action against MONTROSE and/or CTEH or any of their employees, which were under BRUCKHEIMER'S direct supervision and control, including SEALS and BECKNER, when it knew or reasonably should have known interventional action was necessary to address and prevent their behavior of engaging in belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery against Plaintiff;

229.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions by BRUCKHEIMER, Plaintiff was caused to sustained severe, permanent physical, mental, and emotional injuries; Plaintiff continues and will in the future continue to suffer great pain and mental anguish; Plaintiff was, and will in the future be, unable to attend to her usual affairs, duties, and occupation; Plaintiff has been, and in the future will be required to incur expenses for medical and psychological treatment arising from her injuries; and the Plaintiff was otherwise injured or damaged.

**COUNT VII - NEGLIGENT SUPERVISION**
**DIRECTED AT BRUCKHEIMER FILMS**

230.    Plaintiff incorporates by reference Paragraphs 1 through 70 of this Complaint as if fully set forth herein.

231.    At all relevant times, BRUCKHEIMER FILMS had a duty to exercise reasonable care in the supervision of its subsidiaries, contractors, sub-contractors, and their employees working on the production of the Hightown television show in Wilmington, North Carolina.

232.    At all times relevant, BRUCKHEIMER FILMS had a duty to supervise and

protect the employees of its contractors and sub-contractors, including the employees of MONTROSE and CTEH who were under BRUCKHEIMER FILMS' direct supervision and control, including Plaintiff, against unwanted belligerent and harassing behavior on the jobsite, including the making of harassing and inappropriate comments of a sexual nature, such as perpetrated upon Plaintiff by SEALS.

233.   At all times relevant, BRUCKHEIMER FILMS had a duty to supervise and protect the employees of its contractors and sub-contractors, including the employees of MONTROSE and CTEH who were under BRUCKHEIMER FILMS' direct supervision and control, including Plaintiff, against sexual grooming, sexual intimidation, employment intimidation, and unwanted sexual battery, such as perpetrated upon Plaintiff by BECKNER.

234.   At all times relevant, BRUCKHEIMER FILMS had the authority to take action to prevent, protect, and/or intervene when it learned that employees of MONTROSE and/or CTEH under its direct supervision and control were at risk of harm and/or being victimized by belligerent and harassing behavior, sexual grooming, sexual intimidation, employment intimidation, and sexual battery.

235.   At all times relevant, BRUCKHEIMER FILMS knew, or in the exercise of ordinary care should have known, that SEALS was engaging in belligerent and sexually harassing behavior toward Plaintiff.

236.   At all times relevant, BRUCKHEIMER FILMS knew, or in the exercise of ordinary care should have known, that BECKNER was engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff.

237.   In violation of its duties as aforesaid, BRUCKHEIMER FILMS committed one or more of the following acts or omissions:

40

(a) Failed to supervise SEALS and prevent him engaging in belligerent and sexually harassing behavior toward Plaintiff;

(b) Failed to supervise BECKNER and prevent him from engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff;

(c) Disregarded the continuous and ongoing risk of harm that SEALS and BECKNER posed to Plaintiff's well-being and safety;

(d) Failed to protect Plaintiff from the reasonably foreseeable threat posed by SEALS and BECKNER;

(e) Fostered a workplace environment where belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery were allowed against female workers; and

(f) Failed to take action against MONTROSE and/or CTEH or any of their employees, which were under BRUCKHEIMER FILMS' direct supervision and control, including SEALS and BECKNER, when it knew or reasonably should have known interventional action was necessary to address and prevent their behavior of engaging in belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery against Plaintiff;

238. As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions by BRUCKHEIMER FILMS, Plaintiff was caused to sustained severe, permanent physical, mental, and emotional injuries; Plaintiff continues and will in the future continue to suffer great pain and mental anguish; Plaintiff was, and will in the future be, unable to attend to her usual affairs, duties, and occupation; Plaintiff has been, and in the future will be required to incur expenses for medical and psychological treatment arising from her injuries; and the Plaintiff was otherwise injured or damaged.

## COUNT VIII - NEGLIGENT SUPERVISION
## DIRECTED AT BRUCKHEIMER TELEVISION

239. Plaintiff incorporates by reference Paragraphs 1 through 174 of this

41

Complaint as if fully set forth herein.

240.    At all relevant times, BRUCKHEIMER TELEVISION had a duty to exercise reasonable care in the supervision of its subsidiaries, contractors, sub-contractors, and their employees working on the production of the Hightown television show in Wilmington, North Carolina.

241.    At all times relevant, BRUCKHEIMER TELEVISION had a duty to supervise and protect the employees of its contractors and sub-contractors, including the employees of MONTROSE and CTEH who were under BRUCKHEIMER TELEVISION'S direct supervision and control, including Plaintiff, against unwanted belligerent and harassing behavior on the jobsite, including the making of harassing and inappropriate comments of a sexual nature, such as perpetrated upon Plaintiff by SEALS.

242.    At all times relevant, BRUCKHEIMER TELEVISION had a duty to supervise and protect the employees of its contractors and sub-contractors, including the employees of MONTROSE and CTEH who were under BRUCKHEIMER TELEVISION'S direct supervision and control, including Plaintiff, against sexual grooming, sexual intimidation, employment intimidation, and unwanted sexual battery, such as perpetrated upon Plaintiff by BECKNER.

243.    At all times relevant, BRUCKHEIMER TELEVISION had the authority to take action to prevent, protect, and/or intervene when it learned that employees of MONTROSE and/or CTEH under its direct supervision and control were at risk of harm and/or being victimized by belligerent and harassing behavior, sexual grooming, sexual intimidation, employment intimidation, and sexual battery.

244.    At all times relevant, BRUCKHEIMER TELEVISION knew, or in the exercise

42

of ordinary care should have known, that SEALS was engaging in belligerent and sexually harassing behavior toward Plaintiff.

245.   At all times relevant, BRUCKHEIMER TELEVISION knew, or in the exercise of ordinary care should have known, that BECKNER was engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff.

246.   In violation of its duties as aforesaid, BRUCKHEIMER TELEVISION committed one or more of the following acts or omissions:

(a)   Failed to supervise SEALS and prevent him engaging in belligerent and sexually harassing behavior toward Plaintiff;

(b)   Failed to supervise BECKNER and prevent him from engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff;

(c)   Disregarded the continuous and ongoing risk of harm that SEALS and BECKNER posed to Plaintiff's well-being and safety;

(d)   Failed to protect Plaintiff from the reasonably foreseeable threat posed by SEALS and BECKNER;

(e)   Fostered a workplace environment where belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery were allowed against female workers; and

(f)   Failed to take action against MONTROSE and/or CTEH or any of their employees, which were under BRUCKHEIMER TELEVISION'S direct supervision and control, including SEALS and BECKNER, when it knew or reasonably should have known interventional action was necessary to address and prevent their behavior of engaging in belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery against Plaintiff;

247.   As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions by BRUCKHEIMER TELEVISION, Plaintiff was caused to sustained severe, permanent physical, mental, and emotional injuries; Plaintiff continues and will in

the future continue to suffer great pain and mental anguish; Plaintiff was, and will in the future be, unable to attend to her usual affairs, duties, and occupation; Plaintiff has been, and in the future will be required to incur expenses for medical and psychological treatment arising from her injuries; and the Plaintiff was otherwise injured or damaged.

## COUNT IX - NEGLIGENT SUPERVISION
## DIRECTED AT APPLE

248.    Plaintiff incorporates by reference Paragraphs 1 through 70 of this Complaint as if fully set forth herein.

249.    At all relevant times, APPLE had a duty to exercise reasonable care in the supervision of its subsidiaries, contractors, sub-contractors, and their employees working on the production of the feature film Emancipation in New Orleans, Louisiana.

250.    At all times relevant, APPLE had a duty to supervise and protect the employees of its contractors and sub-contractors, including the employees of MONTROSE and CTEH who were under APPLE'S direct supervision and control, including Plaintiff, against unwanted belligerent and harassing behavior on the jobsite, including the making of harassing and inappropriate comments of a sexual nature, such as perpetrated upon Plaintiff by SEALS.

251.    At all times relevant, APPLE had a duty to supervise and protect the employees of its contractors and sub-contractors, including the employees of MONTROSE and CTEH, who were under APPLE'S direct supervision and control, including Plaintiff, against sexual grooming, sexual intimidation, employment intimidation, and unwanted sexual battery, such as perpetrated upon Plaintiff by BECKNER.

252.    At all times relevant, APPLE had the authority to take action to prevent,

protect, and/or intervene when it learned that employees of MONTROSE and/or CTEH under its direct supervision and control were at risk of harm and/or being victimized by belligerent and harassing behavior, sexual grooming, sexual intimidation, employment intimidation, and sexual battery.

253.   At all times relevant, APPLE knew, or in the exercise of ordinary care should have known, that BECKNER was engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff.

254.   In violation of its duties as aforesaid, APPLE committed one or more of the following acts or omissions:

(a)   Failed to supervise SEALS and prevent him engaging in belligerent and sexually harassing behavior toward Plaintiff;

(b)   Failed to supervise BECKNER and prevent him from engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff;

(c)   Disregarded the continuous and ongoing risk of harm that SEALS and BECKNER posed to Plaintiff's well-being and safety;

(d)   Failed to protect Plaintiff from the reasonably foreseeable threat posed by SEALS and BECKNER;

(e)   Fostered a workplace environment where belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery were allowed against female workers; and

(f)   Failed to take action against MONTROSE and/or CTEH or any of their employees, which were under APPLE'S direct supervision and control, including SEALS and BECKNER, when it knew or reasonably should have known interventional action was necessary to address and prevent their behavior of engaging in belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery against Plaintiff;

255.   As a direct and proximate result of one or more of the foregoing negligent

acts and/or omissions by APPLE, Plaintiff was caused to sustained severe, permanent physical, mental, and emotional injuries; Plaintiff continues and will in the future continue to suffer great pain and mental anguish; Plaintiff was, and will in the future be, unable to attend to her usual affairs, duties, and occupation; Plaintiff has been, and in the future will be required to incur expenses for medical and psychological treatment arising from her injuries; and the Plaintiff was otherwise injured or damaged.

## COUNT X - NEGLIGENT SUPERVISION
## DIRECTED AT APPLE PRODUCTIONS

256.    Plaintiff incorporates by reference Paragraphs 1 through173 of this Complaint as if fully set forth herein.

257.    At all relevant times, APPLE PRODUCTIONS had a duty to exercise reasonable care in the supervision of its subsidiaries, contractors, sub-contractors, and their employees working on the production of the feature film Emancipation in New Orleans, Louisiana.

258.    At all times relevant, APPLE PRODUCTIONS had a duty to supervise and protect the employees of its contractors and sub-contractors, including the employees of MONTROSE and CTEH who were under APPLE PRODUCTIONS' direct supervision and control, including Plaintiff, against unwanted belligerent and harassing behavior on the jobsite, including the making of harassing and inappropriate comments of a sexual nature, such as perpetrated upon Plaintiff by SEALS.

259.    At all times relevant, APPLE PRODUCTIONS had a duty to supervise and protect the employees of its contractors and sub-contractors, including the employees of MONTROSE and CTEH who were under APPLE PRODUCTIONS' direct supervision and

control, including Plaintiff, against sexual grooming, sexual intimidation, employment intimidation, and unwanted sexual battery, such as perpetrated upon Plaintiff by BECKNER.

260.    At all times relevant, APPLE PRODUCTIONS had the authority to take action to prevent, protect, and/or intervene when it learned that employees of MONTROSE and/or CTEH under its direct supervision and control were at risk of harm and/or being victimized by belligerent and harassing behavior, sexual grooming, sexual intimidation, employment intimidation, and sexual battery.

261.    At all times relevant, APPLE PRODUCTIONS knew, or in the exercise of ordinary care should have known, that BECKNER was engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff.

262.    In violation of its duties as aforesaid, APPLE PRODUCTIONS committed one or more of the following acts or omissions:

(a)    Failed to supervise SEALS and prevent him engaging in belligerent and sexually harassing behavior toward Plaintiff;

(b)    Failed to supervise BECKNER and prevent him from engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff;

(c)    Disregarded the continuous and ongoing risk of harm that SEALS and BECKNER posed to Plaintiff's well-being and safety;

(d)    Failed to protect Plaintiff from the reasonably foreseeable threat posed by SEALS and BECKNER;

(e)    Fostered a workplace environment where belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery were allowed against female workers; and

(f)    Failed to take action against MONTROSE and/or CTEH or any of their employees, which were under APPLE PRODUCTIONS' direct supervision and control, including SEALS and BECKNER, when it

knew or reasonably should have known interventional action was necessary to address and prevent their behavior of engaging in belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery against Plaintiff;

263.   As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions by APPLE PRODUCTIONS, Plaintiff was caused to sustained severe, permanent physical, mental, and emotional injuries; Plaintiff continues and will in the future continue to suffer great pain and mental anguish; Plaintiff was, and will in the future be, unable to attend to her usual affairs, duties, and occupation; Plaintiff has been, and in the future will be required to incur expenses for medical and psychological treatment arising from her injuries; and the Plaintiff was otherwise injured or damaged.

## COUNT XI - NEGLIGENT SUPERVISION
## DIRECTED AT APPLE STUDIOS

264.   Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

265.   At all relevant times, APPLE STUDIOS had a duty to exercise reasonable care in the supervision of its subsidiaries, contractors, sub-contractors, and their employees working on the production of the feature film Emancipation in New Orleans, Louisiana.

266.   At all times relevant, APPLE STUDIOS had a duty to supervise and protect the employees of its contractors and sub-contractors, including the employees of MONTROSE and CTEH who were under APPLE STUDIOS' direct supervision and control, including Plaintiff, against unwanted belligerent and harassing behavior on the jobsite, including the making of harassing and inappropriate comments of a sexual nature, such as perpetrated upon Plaintiff by SEALS.

48

267. At all times relevant, APPLE STUDIOS had a duty to supervise and protect the employees of its contractors and sub-contractors, including the employees of MONTROSE and CTEH, who were under APPLE STUDIOS' direct supervision and control, including Plaintiff, against sexual grooming, sexual intimidation, employment intimidation, and unwanted sexual battery, such as perpetrated upon Plaintiff by BECKNER.

268. At all times relevant, APPLE STUDIOS had the authority to take action to prevent, protect, and/or intervene when it learned that employees of MONTROSE and/or CTEH under its direct supervision and control were at risk of harm and/or being victimized by belligerent and harassing behavior, sexual grooming, sexual intimidation, employment intimidation, and sexual battery.

269. At all times relevant, APPLE STUDIOS knew, or in the exercise of ordinary care should have known, that SEALS was engaging in belligerent and sexually harassing behavior toward Plaintiff.

270. At all times relevant, APPLE STUDIOS knew, or in the exercise of ordinary care should have known, that BECKNER was engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff.

271. In violation of its duties as aforesaid, APPLE STUDIOS committed one or more of the following acts or omissions:

    (a)    Failed to supervise SEALS and prevent him engaging in belligerent and sexually harassing behavior toward Plaintiff;

    (b)    Failed to supervise BECKNER and prevent him from engaging in activities of sexual grooming, sexual intimidation, employment intimidation, and sexual battery toward Plaintiff;

    (c)    Disregarded the continuous and ongoing risk of harm that SEALS and BECKNER posed to Plaintiff's well-being and safety;

49

     (d)    Failed to protect Plaintiff from the reasonably foreseeable threat posed by SEALS and BECKNER;

     (e)    Fostered a workplace environment where belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery were allowed against female workers; and

     (f)    Failed to take action against MONTROSE and/or CTEH or any of their employees, which were under APPLE STUDIOS' direct supervision and control, including SEALS and BECKNER, when it knew or reasonably should have known interventional action was necessary to address and prevent their behavior of engaging in belligerence, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and sexual battery against Plaintiff;

272.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions by APPLE STUDIOS, Plaintiff was caused to sustained severe, permanent physical, mental, and emotional injuries; Plaintiff continues and will in the future continue to suffer great pain and mental anguish; Plaintiff was, and will in the future be, unable to attend to her usual affairs, duties, and occupation; Plaintiff has been, and in the future will be required to incur expenses for medical and psychological treatment arising from her injuries; and the Plaintiff was otherwise injured or damaged.

## COUNT XII - SEXUAL ASSAULT AND BATTERY
## DIRECTED AT BECKNER

273.    Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

274.    BECKNER is liable to Plaintiff under La. C.C. art. 2315, et seq., for reasons of his non-consensual sexual battery and his unwanted invasions of Plaintiff's person as described above, which constitute a course of conduct and continuous pattern of misconduct, and specifically

including the three episodes where BECKNER forcefully engaged in unwanted sexual intercourse with Plaintiff on March 6, 2021, March 8, 2021, and March 17, 2021.

275.    At all times when BECKNER committed his acts of non-consensual sexual battery and unwanted invasions of Plaintiff's person, BRUCKHER was employed by MONTROSE and its wholly owned subsidiary, CTEH, and BECKNER was acting with MONTROSE AND CTEH'S actual and/or apparent authority as Plaintiff's supervisor with the authority to promote, demote, assign, control, set Plaintiff's rate of pay, and terminate Plaintiff's employment.

276.    MONTROSE, and its wholly owned subsidiary, CTEH, are both vicariously liable for BECKNER'S tortious acts pursuant to La. C.C. art 2320.

277.    BECKNER, MONTROSE and CTEH are liable, jointly, severally, and *in solido*, for damages to Plaintiff, including compensatory and exemplary damages, and for other appropriate relief, by reason of the aforesaid acts of sexual assault and battery.

278.    As a direct and proximate result of BECKNER'S tortious conduct, Plaintiff has suffered, and in the future will continue to suffer permanent personal injuries, including severe emotional distress, physical injuries, and economic losses including expenses for medical and psychological treatment, and a reduction in her earnings, and these injuries continue.

## COUNT XIII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS DIRECTED AT BECKNER

279.    Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

280.    BECKNER'S repeated, non-consensual sexual battery and his unwanted invasions of Plaintiff's person, which constitute a course of conduct and continuous pattern of misconduct, as described above, specifically including the sending of sexually explicit and inappropriate messages,

51

the three episodes where BECKNER forcefully engaged in unwanted sexual intercourse with Plaintiff on March 6, 2021, March 8, 2021, and March 17, 2021, touching Plaintiff on her buttocks, attempting to kiss her, fondle he breasts, and attempting to put money in plaintiff's bra on April 24, 2021, and again attempting to put money in Plaintiff's bra on May 3, 2021, amount to extreme and outrageous conduct on his part against Plaintiff.

281.    BECKNER'S repeated acts of non-consensual sexual battery and his unwanted invasions of Plaintiff's person were atrocious, utterly intolerable in civilized community, and beyond all possible bounds of decency.

282.    At the times BECKNER committed those acts, he desired to inflict severe emotional distress upon Plaintiff, or he knew such severe emotional distress was certain or substantially certain to result in Plaintiff.

283.    At all times when BECKNER committed his acts of non-consensual sexual battery and unwanted invasions of Plaintiff's person, BECKNER was employed by MONTROSE and its wholly owned subsidiary, CTEH, and BECKNER was acting with MONTROSE and CTEH'S actual and/or apparent authority as Plaintiff's supervisor with the authority to promote, demote, assign, control, set Plaintiff's rate of pay, and terminate Plaintiff's employment.

284.    MONTROSE, and its wholly owned subsidiary, CTEH, are both vicariously liable for BECKNER'S tortious acts pursuant to La. C.C. art 2320.

285.    BECKNER, MONTROSE and CTEH are liable, jointly, severally, and *in sloid*, for damages to Plaintiff, arising from BECKNER'S intentional infliction of emotional distress upon Plaintiff.

286.    As a direct and proximate result of BECKNER'S tortious conduct, Plaintiff has suffered, and in the future will continue to suffer severe, extreme, debilitating, and permanent

emotional distress, including physical manifestations, nightmares, flashbacks, loss of concentration, inability to work at the same level, and she has and will in the future incur great economic losses, including expenses for medical and psychological treatment, and a reduction in her earnings, and these injuries continue.

## COUNT XIV - SEXUAL HARASSMENT
## DIRECTED AT CTEH

287.    Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

288.    Plaintiff is a female and is therefore a member of a protected group under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, *et. seq*.

289.    Plaintiff was subjected to belligerent behavior, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and unwanted sexual battery based on her membership in said protected class by CTEH, through its employees and agents, SEALS, and BECKNER as outlined in the Facts Common to All Counts section of this Complaint.

290.    CTEH knew or reasonably should have known of the harassment in question and failed to stop it.

291.    The harassment was sufficiently severe and/or pervasive to alter the conditions of Plaintiff's employment with CTEH.

292.    CTEH'S decision to terminate Plaintiff's employment, rather than taking disciplinary and/or remedial action against SEALS and BECKNER to address their harassment of Plaintiff, constitutes a tangible employment action pursuant to Section 2000e-2(a)(1) of said Act.

293.    Because the harassment culminated in a tangible employment action, CTEH is vicariously liable for SEALS and BECKNER'S harassment of Plaintiff.

294.     The acts described above constitute discrimination based on sex in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, *et seq.* (Title VII), thus rendering CTEH liable unto Plaintiff for compensatory damages, punitive damages, reasonable attorney's fees, and the costs of this lawsuit.

## COUNT XV - SEXUAL HARASSMENT DIRECTED AT MONTROSE

295.     Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

296.     Plaintiff is a female and is therefore a member of a protected group under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, *et. seq*.

297.     Plaintiff was subjected to belligerent behavior, sexual harassment, sexual grooming, sexual intimidation, employment intimidation, and unwanted sexual battery based on her membership in said protected class by MONTROSE, through its wholly owned subsidiary, CTEH, through its employees and agents, SEALS and BECKNER as outlined in the Facts Common to All Counts section of this Complaint.

298.     MONTROSE knew or reasonably should have known of the harassment in question and failed to stop it.

299.     The harassment was sufficiently severe and/or pervasive to alter the conditions of Plaintiff's employment with MONTROSE.

300.     MONTROSE'S decision to terminate Plaintiff's employment, rather than taking disciplinary and/or remedial action against SEALS and BECKNER to address their harassment of Plaintiff, constitutes a tangible employment action pursuant to Section 2000e-2(a)(1) of said Act.

301.     Because the harassment culminated in a tangible employment action, MONTROSE is

vicariously liable for SEALS and BECKNER'S harassment of Plaintiff.

302.   The acts described above constitute discrimination based on sex in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, *et seq.* (Title VII), thus rendering MONTROSE liable unto Plaintiff for compensatory and punitive damages.

**WHEREFORE**, Plaintiff, ALICIA KELLY, prays for judgment against MONTROSE in an amount in excess of $75,000.00 for compensatory damages, punitive damages, reasonable attorney's fees, and the costs of this lawsuit.

## COUNT XVI - SEXUAL HARASSMENT
## DIRECTED AT SEALS

301.   Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

302.   Plaintiff is a female and is therefore a member of a protected group under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, *et. seq.*

303.   Plaintiff was subjected to belligerent and sexually harassing behavior by SEALS, as outlined in the Facts Common to All Counts section of this Complaint.

304.   SEALS knew or reasonably should have known his behavior toward Plaintiff through the making of sexually explicit comments about Plaintiff and Plaintiff's co-workers in Plaintiff's presence constituted harassment, and he failed to stop it when asked to do so by Plaintiff.

305.   SEALS' harassment of Plaintiff was sufficiently severe and/or pervasive to alter the conditions of Plaintiff's employment with MONTROSE and its subsidiary CTEH.

306.   Following his transfer from North Carolina to Arkansas, SEALS continued to have supervisory authority over Plaintiff, and he continued to condone and approve the actions of other

employees of MONTROSE, through its subsidiary, CTEH, including BECKNER, in the sexual harassment of Plaintiff.

307.    Because the harassment culminated in a tangible employment action, MONTROSE and its wholly owned subsidiary, CTEH, are vicariously liable for SEALS' harassment of Plaintiff.

308.    The acts described above constitute discrimination based on sex in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, *et seq.* (Title VII), thus rendering SEALS liable unto Plaintiff for compensatory damages, punitive damages, reasonable attorney's fees, and the costs of this lawsuit.

## COUNT XVII - SEXUAL HARASSMENT
## DIRECTED AT BECKNER

308.    Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

309.    Plaintiff is a female and is therefore a member of a protected group under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, *et. seq*.

310.    Plaintiff was subjected to belligerent and sexually harassing behavior by BECKNER, as outlined in the Facts Common to All Counts section of this Complaint, which constitute a course of conduct and continuous pattern of misconduct, as described above, specifically including the sending of sexually explicit and inappropriate messages, the three episodes where BECKNER forcefully engaged in unwanted sexual intercourse with Plaintiff on March 6, 2021, March 8, 2021, and March 17, 2021, touching Plaintiff on her buttocks, attempting to kiss her, and attempting to put money in plaintiff's bra on April 24, 2021, and again attempting to put money in Plaintiff's bra on May 3, 2021.

311.    BECKNER knew or reasonably should have known his behavior toward Plaintiff

through the making of sexually explicit comments about Plaintiff and Plaintiff's co-workers in Plaintiff's presence, sexual grooming, sexual intimidation, employment intimidation, and unwanted sexual battery constituted harassment, and he failed to stop it when asked to do so by Plaintiff.

312.     SEALS' harassment of Plaintiff was sufficiently severe and/or pervasive to alter the conditions of Plaintiff's employment with MONTROSE and its subsidiary CTEH.

313.     Because the harassment culminated in a tangible employment action, MONTROSE and its wholly owned subsidiary, CTEH, are vicariously liable for BECKNER'S harassment of Plaintiff.

314.     The acts described above constitute discrimination based on sex in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, *et seq.* (Title VII), thus rendering SEALS liable unto Plaintiff for compensatory damages, punitive damages, reasonable attorney's fees, and the costs of this lawsuit.

## COUNT XVIII – WAGE DISCRIMINATION BASED ON SEX (TITLE VII) DIRECTED AT CTEH

315.     Plaintiff incorporates by reference Paragraphs 1 through 174 of           this Complaint as if fully set forth herein.

316.     Plaintiff is a female and is therefore a member of a protected group under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, *et. seq.*

317.     As outlined in the Facts Common to All Counts section of this Complaint, while employed by CTEH, Plaintiff was paid less than her male counterparts performing the same job duties and holding the same job title. Specifically, Plaintiff was paid $25.00 per hour as a Testing Coordinator working on a television production when her male counterparts were being paid up to $35.00 to perform the same work, and Plaintiff was initially offered $40.00 per hour and not paid

more than $60.00 per hour as a Health and Safety Manager working on a feature film production when her male counterparts performing the same job title, duties, and responsibilities were being paid a minimum of $75.00 per hour.

318.    CTEH knew of this wage discrepancy based on sex because Plaintiff demanded equal pay from CTEH.

319.    Despite Plaintiff's demand for equal pay, CTEH failed to pay her the same wage as her male counterparts performing the same job duties and holding the same job title.

320.    CTEH'S wage discrimination based on sex was sufficiently severe and/or pervasive to alter the conditions of Plaintiff's employment with CTEH.

321.    CTEH'S decision not to remedy a discriminatory sex-based discrepancy in pay constitutes a tangible employment action pursuant to Section 2000e-2(a)(1) of said Act.

322.    The acts described above constitute discrimination based on sex in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, *et seq.* (Title VII), thus rendering CTEH liable unto Plaintiff for compensatory damages, punitive damages, reasonable attorney's fees, and the costs of this lawsuit.

## COUNT XIX – WAGE DISCRIMINATION BASED ON SEX (TITLE VII) DIRECTED AT MONTROSE

323.    Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

324.    Plaintiff is a female and is therefore a member of a protected group under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, *et. seq*.

325.    As outlined in the Facts Common to All Counts section of this Complaint, while employed by MONTROSE, Plaintiff was paid less than her male counterparts performing the same

job duties and holding the same job title. Specifically, Plaintiff was paid $25.00 per hour as a Testing

Coordinator working on a television production when her male counterparts were being paid up to

$35.00 to perform the same work, and Plaintiff was initially offered $40.00 per hour and not paid

more than $60.00 per hour as a Health and Safety Manager working on a feature film production

when her male counterparts performing the same job title, duties, and responsibilities were being

paid a minimum of $75.00 per hour.

326.    MONTROSE knew of this wage discrepancy based on sex because Plaintiff

demanded equal pay from MONTROSE through its wholly owned subsidiary, CTEH.

327.    Despite Plaintiff's demand for equal pay, MONTROSE failed to pay her the same

wage as her male counterparts performing the same job duties and holding the same job title.

328.    MONTROSE'S wage discrimination based on sex was sufficiently severe and/or

pervasive to alter the conditions of Plaintiff's employment with MONTROSE.

329.    MONTROSE'S decision not to remedy a discriminatory sex-based discrepancy in pay

constitutes a tangible employment action pursuant to Section 2000e-2(a)(1) of said Act.

330.    The acts described above constitute discrimination based on sex in violation of Title

VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e,

*et seq.* (Title VII), thus rendering MONTROSE liable unto Plaintiff for compensatory damages,

punitive damages, reasonable attorney's fees, and the costs of this lawsuit.

### COUNT XX – WAGE DISCRIMINATION BASED ON SEX (EQUAL PAY ACT) DIRECTED AT CTEH

331.    Plaintiff incorporates by reference Paragraphs 1 through 174 of this

Complaint as if fully set forth herein.

332.    Plaintiff is a female and is therefore a member of a protected group under Title VII of

the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, *et. seq*.

333.    As outlined in the Facts Common to All Counts section of this Complaint, while employed by MONTROSE, Plaintiff was paid less than her male counterparts performing the same job duties and holding the same job title. Specifically, Plaintiff was paid $25.00 per hour as a Testing Coordinator working on a television production when her male counterparts were being paid up to $35.00 to perform the same work, and Plaintiff was initially offered $40.00 per hour and not paid more than $60.00 per hour as a Health and Safety Manager working on a feature film production when her male counterparts performing the same job title, duties, and responsibilities were being paid a minimum of $75.00 per hour.

334.    CTEH knew of this wage discrepancy based on sex because Plaintiff demanded equal pay from CTEH.

335.    CTEH'S discriminatory sex-based discrepancy in pay constitutes a tangible employment action pursuant to the Equal Pay Act of 1963, 29 U.S.C. 206(d).

336.    The acts described above constitute discrimination based on sex in violation of the Fair Labor Standards Act of 1938, 26 U.S.C., 201, *et. seq.*, as amended by the Equal Pay Act of 1963, 29 U.S.C. 206(d), thus rendering CTEH liable unto Plaintiff for compensatory and punitive damages.

## COUNT XXI – WAGE DISCRIMINATION BASED ON SEX (EQUAL PAY ACT) DIRECTED AT MONTROSE

337.    Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

338.    Plaintiff is a female and is therefore a member of a protected group under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, *et. seq*.

339.     As outlined in the Facts Common to All Counts section of this Complaint, while employed by MONTROSE, Plaintiff was paid less than her male counterparts performing the same job duties and holding the same job title. Specifically, Plaintiff was paid $25.00 per hour as a Testing Coordinator working on a television production when her male counterparts were being paid up to $35.00 to perform the same work, and Plaintiff was initially offered $40.00 per hour and not paid more than $60.00 per hour as a Health and Safety Manager working on a feature film production when her male counterparts performing the same job title, duties, and responsibilities were being paid a minimum of $75.00 per hour.

340.     MONTROSE knew of this wage discrepancy based on sex because Plaintiff demanded equal pay from MONTROSE, through its wholly owned subsidiary CTEH.

341.     MONTROSE'S discriminatory sex-based discrepancy in pay constitutes a tangible employment action pursuant to the Equal Pay Act of 1963, 29 U.S.C. 206(d).

342.     The acts described above constitute discrimination based on sex in violation of the Fair Labor Standards Act of 1938, 26 U.S.C., 201, *et. seq.*, as amended by the Equal Pay Act of 1963, 29 U.S.C. 206(d), thus rendering MONTROSE liable unto Plaintiff for compensatory and punitive damages.

## COUNT XXII – WRONGFUL DISCHARGE (FAIR LABOR STANDARDS ACT) DIRECTED AT CTEH

343.     Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

344.     Plaintiff is a female and is therefore a member of a protected group under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, *et. seq*.

345.     As outlined in the Facts Common to All Counts section of this Complaint, while

employed by MONTROSE, Plaintiff was paid less than her male counterparts performing the same job duties and holding the same job title. Specifically, Plaintiff was paid $25.00 per hour as a Testing Coordinator working on a television production when her male counterparts were being paid up to $35.00 to perform the same work, and Plaintiff was initially offered $40.00 per hour and not paid more than $60.00 per hour as a Health and Safety Manager working on a feature film production when her male counterparts performing the same job title, duties, and responsibilities were being paid a minimum of $75.00 per hour.

346.   On or about June 18, 2021, Plaintiff formally reported various acts of sexual discrimination and misconduct by her immediate supervisor and other employees of CTEH to that company, through SELBY, which included her discriminant pay, and Plaintiff sought a meeting with SELBY to discuss her allegations in detail.

347.   As a direct result of filing a formal complaint against CTEH, Plaintiff was terminated from its employment on or about June 21, 2021.

348.   CTEH'S termination of Plaintiff's employment immediately following her filing of a formal complaint based on discriminatory practices, including wage discrimination based on sex, is a prohibited act by CTEH pursuant to the Fair Labor Standards Act of 1938, 29 U.S.C. 215(a)(3).

349.   CTEH'S discriminatory sex-based discrepancy in pay constitutes a tangible employment action pursuant to that Act.

350.   The acts described above constitute an unlawful termination of employment in violation of the Fair Labor Standards Act of 1938, 26 U.S.C., 201, *et. seq.*, thus rendering CTEH liable unto Plaintiff for compensatory and punitive damages.

## <u>COUNT XXIII – WRONGFUL DISCHARGE (FAIR LABOR STANDARDS ACT) DIRECTED AT MONTROSE</u>

351.    Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

352.    Plaintiff is a female and is therefore a member of a protected group under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, *et. seq*.

353.    While employed by MONTROSE, through its wholly owned subsidiary, CTEH, Plaintiff was paid less than her male counterparts performing the same job duties and holding the same job title.

354.    On or about June 18, 2021, Plaintiff formally reported various acts of sexual discrimination and misconduct by her immediate supervisor and other employees of CTEH to MONTROSE through its agents and employees at CTEH, including SELBY, which included her discriminant pay, and Plaintiff sought a meeting with SELBY to discuss her allegations in detail.

355.    As a direct result of filing a formal complaint against CTEH, Plaintiff was terminated from employment by MONTROSE on or about June 21, 2021.

356.    MONTROSE'S termination of Plaintiff's employment immediately following her filing of a formal complaint based on discriminatory practices, including wage discrimination based on sex, is a prohibited act by MONTROSE pursuant to the Fair Labor Standards Act of 1938, 29 U.S.C. 215(a)(3).

357.    MONTROSE'S discriminatory sex-based discrepancy in pay constitutes a tangible employment action pursuant to that Act.

358.    The acts described above constitute an unlawful termination of employment in violation of the Fair Labor Standards Act of 1938, 26 U.S.C., 201, *et. seq.*, thus rendering

MONTROSE liable unto Plaintiff for compensatory and punitive damages.

## COUNT XXIV - VIOLATION OF FEDERAL SEX TRAFFICKING STATUTES DIRECTED AGAINST BECKNER

359.    Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

360.    Plaintiff is authorized to bring this civil claim against BECKNER pursuant to 18 U.S.C. § 1595(a), which provides a civil remedy for victims of human trafficking as defined in the Trafficking Victims Protection Act (TVPA) set forth in 18 U.S.C. 1591.

361.    In violation of 18 U.S.C. §§ 1591 and 1595(a), BECKNER recruited, enticed, harbored, transported, obtained, maintained, and/or patronized Plaintiff knowing that he would use force, threats of force, fraud, and/or coercion to cause Plaintiff to engage in a commercial sexual act.

362.    In violation of 18 U.S.C. §§ 1591 and 1595(a), BECKNER knowingly caused Plaintiff to engage in commercial sexual acts with him by means of use force, threats of force, fraud, and/or coercion as defined in 18 U.S.C. § 1591 by engaging in the following acts:

   a)    Use of threats of serious harm as defined by 18 U.S.C. § 1591(e)(5), which constitutes "coercion" pursuant to 18 U.S.C. § 1591(e)(2);

   b)    Use of a scheme, plan, or pattern intended to cause Plaintiff to believe that, if she did not perform such sexual labor or services, she would suffer serious harm or physical restraint which constitutes "coercion" pursuant to 18 U.S.C. § 1591(e)(2); and

   c)    Use of fraud, by knowingly making a misrepresentation of material fact with the intent to deceive Plaintiff, thereby causing Plaintiff to justifiably rely on his misrepresentation resulting in harm to Plaintiff.

363.    The sexual activity in which Plaintiff was forced to engage with BECKNER meets the definition of commercial sexual activity as defined by of 18 U.S.C. § 1591(e)(3) because something of value, namely Plaintiff's employment at MONTROSE and its wholly owned

subsidiary CTEH, was promised, given in exchange for, and conditioned on the performance of sexual acts.

364.    BECKNER knowingly benefitted from his own recruitment, enticement, harboring, transporting, and/or obtaining of Plaintiff by receiving sexual services and labor from Plaintiff in exchange for providing her with a job at MONTROSE, through its wholly owned subsidiary, CTEH.

365.    BECKNER'S tortious acts toward Plaintiff were "in or affecting" interstate and/or foreign commerce, including by (1) using his position at a MONTROSE, which is a multi-state and multinational publicly traded corporation to coerce Plaintiff into engaging in commercial sexual acts, (2) using the promise of a position at a multinational publicly traded corporation to recruit and entice Plaintiff to provide him with sexual labor and services, (3) by forcing Plaintiff to engage in sexual acts with him in order to maintain her employment at that multinational publicly traded corporation, and (4) using the channels and instrumentalities of interstate commerce to facilitate the trafficking through the use of phone calls and text messages.

366.    As a direct and proximate result of BECKNER'S actions, which constitute a course of conduct and continuous pattern of misconduct, as described above, specifically including the sending of sexually explicit and inappropriate messages, the three episodes where BECKNER forcefully engaged in unwanted sexual intercourse with Plaintiff on March 6, 2021, March 8, 2021, and March 17, 2021, touching Plaintiff on her buttocks, attempting to kiss her, fondling her breasts, and attempting to put money in plaintiff's bra on April 24, 2021, and again attempting to put money in Plaintiff's bra on May 3, 2021, Plaintiff has suffered personal injuries of a permanent nature, including severe emotional distress, physical injuries, and economic losses, and these injuries continue.

367.     MONTROSE and its wholly owned subsidiary CTEH are vicariously liable for BECKNER'S tortious acts described herein pursuant to La. C.C. art 2320.

368.     BECKNER, MONTROSE and CTEH are liable, jointly, severally, and *in solido*, for damages to Plaintiff, and for other appropriate relief, by reason of the aforesaid acts of BECKNER.

## COUNT XXV - VIOLATION OF LOUISIANA SEX TRAFFICKING STATUTE DIRECTED AGAINST BECKNER

369.     Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

370.     Plaintiff is authorized to bring this civil claim against BECKNER, MONTROSE, and CTEH pursuant to LSA-R.S. § 46:2163, which provides a state law cause of action for victims of human trafficking as defined by LSA-R.S. § 14:46.2.

371.     BECKNER did knowingly recruit, harbor, transport, provide, solicit, receive, isolate, entice, obtain, and/or maintain the use of Plaintiff through fraud, force, and/or coercion with the intention of forcing her into sexual labor and services for him in violation of LSA-R.S. § 14:46.2.

372.     The sexual activity in which Plaintiff was forced to engage with BECKNER meets the definition of commercial sexual activity as defined by of LSA-R.S. § 14:46.2(C)(1) because something of value, namely Plaintiff's employment at MONTROSE and its wholly owned subsidiary CTEH, was promised and in fact given in exchange for and conditioned on the performance of sexual acts.

373.     In order to obtain sexual services from Plaintiff, BECKNER knowingly engaged in acts which constitute fraud, force, or coercion as defined in LSA-R.S. § 14:46.2, in the following ways:

a)      Using a plan, pattern, or statement with intent to cause Plaintiff to believe that failure to perform an act will result in the use of force against, abduction

of, serious harm to, and/or physical restraint of Plaintiff;

b)   Physically restraining or threatening to physically restrain Plaintiff;

c)   Using debt bondage by forcing Plaintiff to engage in commercial sexual activity in payment toward or satisfaction of purported debt;

d)   Using civil and/or criminal fraud by making a misrepresentation of material fact with the intent to deceive Plaintiff, thereby causing Plaintiff's justifiable reliance resulting in injury to Plaintiff; and

e)   Using extortion as defined in LSA-R.S. § 14:66 by communicating a threat to do harm to Plaintiff with the intention of obtaining something of value from the Plaintiff, namely, commercial sexual acts.

374.   BECKNER knowingly benefitted from his recruitment, enticement, harboring, transporting, providing, soliciting, receiving, isolating, maintaining, and/or obtaining of Plaintiff by receiving commercial sexual services from Plaintiff.

375.   As a direct and proximate result of BECKNER'S actions, which constitute a course of conduct and continuous pattern of misconduct, as described above, specifically including the sending of sexually explicit and inappropriate messages, the three episodes where BECKNER forcefully engaged in unwanted sexual intercourse with Plaintiff on March 6, 2021, March 8, 2021, and March 17, 2021, touching Plaintiff on her buttocks, attempting to kiss her, fondling her breasts, and attempting to put money in plaintiff's bra on April 24, 2021, and again attempting to put money in Plaintiff's bra on May 3, 2021, Plaintiff has suffered personal injuries of a permanent nature, including severe emotional distress, physical injuries, and economic losses, and these injuries continue.

376.   MONTROSE and its wholly owned subsidiary CTEH are vicariously liable for BECKNERS' tortious acts pursuant to La. C.C. art 2320.

377.   BECKNER, MONTROSE and CTEH are liable, jointly, severally, and *in solido*, for

damages to Plaintiff, and for other appropriate relief, by reason of the aforesaid acts of BECKNER.

### COUNT XXVI - VIOLATION OF FEDERAL SEX TRAFFICKING STATUTES DIRECTED AGAINST MONTROSE

378.    Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

379.    Plaintiff is authorized to bring this civil claim against MONTROSE pursuant to 18 U.S.C. § 1595(a), which provides a civil remedy for victims of human trafficking as defined in the TVPA set forth in 18 U.S.C. § 1591.

380.    MONTROSE was the direct employer of BECKNER, upon whom they bestowed financial payments, assistance, and authority, including the authority to hire and fire other employees of MONTROSE and its wholly owned subsidiary, CTEH. Therefore, MONTROSE was associated with BECKNER in a "venture" as defined by 18 U.S.C. § 1591(e)(6) and 18 U.S.C. § 1591(e)(4).

381.    In violation of 18 U.S.C. §§ 1591 and 1595(a), BECKNER, acting in his official capacity as an agent and employee of MONTROSE, when BECKNER recruited, enticed, harbored, transported, obtained, maintained, and/or patronized Plaintiff knowing that he would use force, threats of force, fraud, and/or coercion to cause Plaintiff to engage in commercial sexual acts.

382.    In violation of 18 U.S.C. §§ 1591 and 1595(a), BECKNER, acting in his official capacity as an agent and employee of MONTROSE, did in fact knowingly cause Plaintiff to engage in commercial sexual acts with him by means of use of force, threats of force, fraud, and/or coercion as defined in 18 U.S.C. § 1591, by engaging in the following acts:

a)    Use of threats of serious harm as defined by 18 U.S.C. § 1591(e)(5), which constitutes "coercion" pursuant to 18 U.S.C. § 1591(e)(2);

b)    Use of a scheme, plan, or pattern intended to cause Plaintiff to believe that, if that she did not perform such sexual labor or services, she would suffer serious harm or physical restraint which constitutes "coercion" pursuant to 18

U.S.C. § 1591(e)(2);

    c)    Use of fraud, by knowingly making a misrepresentation of material fact with the intent to deceive Plaintiff, thereby causing Plaintiff to justifiably rely on his misrepresentation resulting in harm to Plaintiff.

383.    BECKNER'S acts toward Plaintiff were in or affecting interstate and/or foreign commerce, including by (1) using his position at MONTROSE, which is a multinational publicly traded corporation, to coerce plaintiff into engaging in commercial sexual acts, (2) using the promise of a position MONTROSE to recruit and entice Plaintiff to provide BECKNER with sexual labor and services, (3) by forcing Plaintiff to engage in sexual acts with BECKNER in order to maintain her employment at MONTROSE, and (4) using the channels and instrumentalities of interstate commerce to facilitating the trafficking through the use of phone calls, text messages, and email.

384.    The sexual activity in which Plaintiff was forced to engage with BECKNER meets the definition of commercial sexual activity as defined by of 18 U.S.C. § 1591(e)(3) because something of value, namely a job at MONTROSE and its subsidiary, CTEH was promised and in fact given in exchange for the performance of sexual acts.

385.    MONTROSE participated in a venture with BECKNER that violated 18 U.S.C. § 1591(a), by knowingly assisting, supporting, and/or facilitating BECKNER as defined in 18 U.S.C. § 1591(e)(4).

386.    MONTROSE had actual knowledge and had been directly informed that BECKNER had used his position of authority and control over Plaintiff as her direct supervisor at MONTROSE, through its subsidiary, CTEH, to engage in sexual activity with BECKNER in exchange for keeping HER job at MONTROSE and its subsidiary, CTEH. Thus, MONTROSE acted knowingly when it participated in a venture with BECKNER, to use force, threats of force, fraud, and/or coercion to cause Plaintiff to engage in commercial sexual acts.

387.    Alternatively, MONTROSE, through its subsidiary, CTEH should have known but recklessly disregarded the fact that BECKNER, with whom MONTROSE was participating in a venture, was using his position at MONTROSE, through its wholly owned subsidiary, CTEH, to use force, threats of force, fraud, and/or coercion to cause Plaintiff to engage in a commercial sexual act, including by recklessly disregarding the following indicators:

a)    Open and obvious grooming behavior by BECKNER toward Plaintiff made in the presence of other MONTROSE and CTEH employees;

b)    General knowledge amongst MONTROSE and CTEH employees that BECKNER had engaged in sexual activity with other subordinate female employees working at MONTROSE and/or CTEH to engage in commercial sexual acts with himself in exchange for the right to keep their jobs at MONTROSE and/or CTEH;

c)    BECKNER'S public bragging to MONTROSE and/or CTEH employees that he was having sex with Plaintiff; and

d)    Other indications that BECKNER was causing Plaintiff to engage in commercial sexual acts with himself in exchange for the right to keep her job at MONTROSE and/or CTEH through the specialized treatment BECKNER gave to Plaintiff, including fine dining, manicures, pedicures, buying alcoholic beverages for Plaintiff, force, fraud, and coercion, which will be shown at a trial of this matter.

388.    MONTROSE knowingly benefitted from its participation in a venture with BECKNER, in violation of the TVPA, which benefit is described further below.

389.    MONTROSE had a duty to take reasonable precautions to protect its employees and the employees of its subsidiary, CTEH, including Plaintiff, from sexual harassment, sex crimes, and sex trafficking perpetrated by MONTROSE'S own agents or employees.

390.    The implementation and enforcement of said reasonable precautions would have caused MONTROSE to incur significant costs in terms of money, time, and resources.

391.    MONTROSE, through its subsidiary, CTEH, also had a duty to properly investigate

employee reports of sexual harassment, sex crimes, and sex trafficking committed by its own agents or employees.

392.    Conducting said adequate investigations would have caused MONTROSE and/or its subsidiary, CTEH to incur significant costs in terms of money, time, and resources.

393.    MONTROSE and its subsidiary, CTEH, have the financial resources to implement adequate precautions as well as adequate investigations.

394.    Despite having the resources to fulfil their duties, MONTROSE through its subsidiary, CTEH, refused to implement adequate precautions or conduct adequate investigations because refusing to do so benefitted MONTROSE'S bottom line.

395.    By refusing to implement adequate precautions or conduct adequate investigations, MONTROSE, through its subsidiary, CTEH, benefitted from the avoidance of the costs and expenses associated with implementing these reasonable precautionary measures, thus directly reducing their overhead expenses.

396.    MONTROSE'S reckless disregard for BECKNER'S conduct in violation of the TVPA constitutes "participation in a venture" with BECKNER because in doing so, they knowingly assisted, supported, and facilitated BECKNER by allowing him to continue his tortious conduct while MONTROSE reaped the benefits of BECKNER'S labor, and in fact by emboldening him to proliferate his sexual exploitation of employees, including Plaintiff, without fear of reprimand, prosecution or financial penalty.

397.    MONTROSE'S reckless disregard for BECKNER'S conduct in violation of the TVPA also assisted, supported, and facilitated BECKNER'S tortious conduct by creating a toxic culture of fear and zero-accountability in which employees working under BECKNER, including Plaintiff, were conditioned never to question or report BECKNER'S tortious conduct.

71

398.    As a result of this toxic culture which facilitated BECKNER'S tortious conduct, which constitute a course of conduct and continuous pattern of misconduct, as described above, specifically including the sending of sexually explicit and inappropriate messages, the three episodes where BECKNER forcefully engaged in unwanted sexual intercourse with Plaintiff on March 6, 2021, March 8, 2021, and March 17, 2021, touching Plaintiff on her buttocks, attempting to kiss her, and attempting to put money in plaintiff's bra on April 24, 2021, and again attempting to put money in Plaintiff's bra on May 3, 2021, MONTROSE, through its subsidiary, CTEH, benefitted by reaping the labor, services, and benefits of a compliant and submissive work force, while avoiding the costs and expenses associated with the investigation and management of human resources complaints, ultimately reducing their overhead expenses further.

399.    Additionally, MONTROSE, through its subsidiary, CTEH, benefitted from its reckless disregard of BECKNER'S conduct in violation of the TVPA by continuing to reap the benefits of BECKNER'S labor even after receiving complaints of his abusive behavior, and allowing BECKNER to remain in his position as their agent and as a Health and Safety Supervisor working on the productions of a television series and a feature film, thereby avoiding the cost, disruption, and use of resources which would have been incurred if MONTROSE were to have to select and train a new Health and Safety Supervisor to replace BECKNER.

400.    MONTROSE, through its subsidiary, CTEH, further benefitted from the production, utility, and value of Plaintiff's continued labor at its subsidiary, CTEH, that was maintained by means of force, threats of force, fraud, and/or coercion as defined in 18 U.S.C. § 1591 by BECKNER'S actions.

401.    MONTROSE, through its subsidiary, CTEH, further benefitted by avoiding the costs of paying Plaintiff her hourly wage and any overtime pay she would have been owed by

MONTROSE, through its subsidiary, CTEH, if the additional hours she spent performing commercial sexual activities had included in the computation of her work hours each week, which activities BECKNER, in his capacity as an agent and employee of MONTROSE and its subsidiary, CTEH, had coerced Plaintiff into performing as a condition of her job at MONTROSE.

402.    In addition to participating with BECKNER in a venture which violated the TVPA, MONTROSE, through its subsidiary, CTEH, also knowingly aided and abetted BECKNER'S violations of 18 U.S.C. § 1591(a) by providing financial payments and authority, including the authority to fire Plaintiff, when MONTROSE knew or recklessly disregarded the fact that BECKNER, in his capacity as an agent for MONTROSE and its subsidiary, CTEH, was using his position to cause Plaintiff to engage in commercial sexual acts by means of use of force, threats of force, fraud, or coercion.

403.    As a direct and proximate result of the actions of MONTROSE, through its subsidiary, CTEH, Plaintiff has suffered personal injuries, including severe emotional distress, physical injuries, and economic losses, and these injuries continue.

### COUNT XXVII - VIOLATION OF LOUISIANA SEX TRAFFICKING STATUTES BY MONTROSE

404.    Plaintiff incorporates by reference Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

405.    Plaintiff is authorized to bring this civil claim against Defendants pursuant to LSA-R.S. § 46:2163, which provides a state law cause of action for victims of human trafficking as defined by LSA-R.S. LSA-R.S. § 14:46.2.

406.    LSA-R.S. § 14:46.2 makes it unlawful for any person to "knowingly benefit from activity prohibited by the provisions of this Section."

407.   LSA-R.S. § 14:46.2 also makes it unlawful to "knowingly facilitate any of the activities prohibited by the provisions of this Section by any means, including but not limited to helping, aiding, abetting, or conspiring, regardless of whether a thing of value has been promised to or received by the person."

408.   BECKNER, while acting in his official capacity as an agent and employee of MONTROSE, through its subsidiary, CTEH, did knowingly recruit, harbor, transport, provide, solicit, receive, isolate, entice, obtain, and/or maintain the use of Plaintiff through fraud, force, and/or coercion with the intention of forcing her into sexual labor and services for him in violation of LSA-R.S. § 14:46.2.

409.   The sexual activity which Plaintiff was forced to engage in with BECKNER meets the definition of commercial sexual activity as defined by of LSA-R.S. § 14:46.2(C)(1) because something of value, namely employment at MONTROSE, was promised and in fact given in exchange for and conditioned on the performance of sexual acts.

410.   In order to obtain sexual services from Plaintiff, BECKNER, while acting in his official capacity as an agent and employee of MONTROSE and its subsidiary, CTEH, knowingly engaged in acts which constitute fraud, force, or coercion as defined in LSA-R.S. § 14:46.2, in the following ways:

    a)    Using of a plan, pattern, or statement with intent to cause Plaintiff to believe that failure to perform an act will result in the use of force against, abduction of, serious harm to, and/or physical restraint of Plaintiff;

    b)    Physically restraining or threatening to physically restrain Plaintiff;

    c)    Using debt bondage by forcing Plaintiff to engage in commercial sexual activity in payment toward or satisfaction of purported debt;

d)      Using civil and/or criminal fraud by making a misrepresentation of material fact with the intent to deceive Plaintiff, thereby causing Plaintiff's justifiable reliance resulting in injury to Plaintiff; and

e)      Using extortion as defined in LSA-R.S. § 14:66 by communicating a threat to do harm to Plaintiff with the intention of obtaining something of value from the Plaintiff, namely, commercial sexual acts.

411.    Upon information and belief, MONTROSE and its subsidiary, CTEH, knew that BECKNER, while acting as an employee and agent of MONTROSE and CTEH, was using his position to violate LSA-R.S. § 14:46.2 by using fraud, force, and/or coercion to cause Plaintiff to engage in commercial sexual acts. MONTROSE's knowledge of BECKNER' conduct is evidenced by the following facts:

a)      Open and obvious grooming behavior by BECKNER toward Plaintiff made in the presence of other MONTROSE and CTEH employees;

b)      General knowledge amongst MONTROSE and CTEH employees that BECKNER had engaged in sexual activity with other subordinate female employees working at MONTROSE and/or CTEH to engage in commercial sexual acts with himself in exchange for the right to keep their jobs at MONTROSE and/or CTEH;

c)      BECKNER'S public bragging to MONTROSE and/or CTEH employees that he was having sex with Plaintiff; and

d)      Other indications that BECKNER was causing Plaintiff to engage in commercial sexual acts with himself in exchange for the right to keep her job at MONTROSE and/OT CTEH through the specialized treatment BECKNER gave to Plaintiff, including fine dining, manicures, pedicures, buying alcoholic beverages for Plaintiff, force, fraud, and coercion, which will be shown at a trial of this matter.

412.    Defendant MONTROSE knowingly benefitted from the tortious conduct of BECKNER in violation of LSA-R.S. § 14:46.2, which benefits are described further below.

413.    MONTROSE has a duty to take reasonable precautions to protect its employees, including the employees of its subsidiary, CTEH, from sexual harassment, sex crimes, and sex

trafficking perpetrated by MONTROSE's own agents or employees.

414.    The implementation and enforcement of said reasonable precautions would cause MONTROSE and its subsidiary, CTEH, to incur significant costs in terms of money, time, and resources.

415.    MONTROSE also has a duty to properly investigate employee reports of sexual harassment, sex crimes, and sex trafficking of its employees by MONTROSE's own agents or employees, including the agents and employees of its subsidiary, CTEH.

416.    Conducting said adequate investigations would cause MONTROSE to incur significant costs in terms of money, time, and resources.

417.    MONTROSE has the financial resources to implement adequate precautions as well as adequate investigations.

418.    Despite having the resources to fulfil their duties, MONTROSE and its subsidiary, CTEH, refused to implement adequate precautions or conduct adequate investigations because refusing to do so benefitted MONTROSE's bottom line.

419.    By refusing to implement adequate precautions or conduct adequate investigations, MONTROSE benefitted from the avoidance of the costs and expenses associated with implementing reasonable precautionary measures, thus directly reducing their overhead expenses.

420.    MONTROSE's knowing disregard for BECKNER'S conduct in violation of LSA-R.S. § 14:46.2 facilitated BECKNER'S tortious conduct by helping, aiding, and abetting BECKNER by allowing him to continue his tortious conduct while MONTROSE and its subsidiary, CTEH, reaped the benefits of BECKNER'S labor, and in fact, by emboldening him to proliferate his sexual exploitation of employees without fear of prosecution or financial penalty.

421.    MONTROSE'S knowing disregard for BECKNER'S conduct in violation of LSA-

R.S. § 14:46.2 also facilitated BECKNER' tortious conduct by helping, aiding, and abetting BECKNER by creating a toxic culture of fear and zero-accountability in which employees working under BECKNER were conditioned never to question or report BECKNER'S tortious conduct.

422.    As a result of this toxic culture which facilitated BECKNER'S tortious conduct, which constitute a course of conduct and continuous pattern of misconduct, as described above, specifically including the sending of sexually explicit and inappropriate messages, the three episodes where BECKNER forcefully engaged in unwanted sexual intercourse with Plaintiff on March 6, 2021, March 8, 2021, and March 17, 2021, touching Plaintiff on her buttocks, attempting to kiss her, fondling her breasts, and attempting to put money in plaintiff's bra on April 24, 2021, and again attempting to put money in Plaintiff's bra on May 3, 2021, MONTROSE and its subsidiary, CTEH, benefitted by reaping the labor, services, and benefits of a compliant and submissive work force, while avoiding the costs and expenses associated with the investigation and management of human resources complaints, ultimately reducing their overhead expenses further.

423.    Additionally, MONTROSE, through its subsidiary, CTEH, benefitted from its reckless disregard of BECKNER'S conduct in violation of the TVPA by continuing to reap the benefits of BECKNER'S labor even after receiving complaints of his abusive behavior, and allowing BECKNER to remain in his position as their agent and as a Health and Safety Supervisor working on the productions of a television series and a feature film, thereby avoiding the cost, disruption, and use of resources which would have been incurred if MONTROSE were to have to select and train a new Health and Safety Supervisor to replace BECKNER.

424.    MONTROSE, through its subsidiary, CTEH, further benefitted from the production, utility, and value of Plaintiff's continued labor at its subsidiary, CTEH, that was maintained by means of force, threats of force, fraud, and/or coercion as defined in 18 U.S.C. § 1591 by

BECKNER'S actions.

425.    MONTROSE, through its subsidiary, CTEH, further benefitted by avoiding the costs of paying Plaintiff her hourly wage and any overtime pay she would have been owed by MONTROSE, through its subsidiary, CTEH, if the additional hours she spent performing commercial sexual activities had included in the computation of her work hours each week, which activities BECKNER, in his capacity as an agent and employee of MONTROSE and its subsidiary, CTEH, had coerced Plaintiff into performing as a condition of her job at MONTROSE.

426.    In addition to participating with BECKNER in a venture which violated the TVPA, MONTROSE, through its subsidiary, CTEH, also knowingly aided and abetted BECKNER'S violations of 18 U.S.C. § 1591(a) by providing financial payments and authority, including the authority to fire Plaintiff, when MONTROSE knew or recklessly disregarded the fact that BECKNER, in his capacity as an agent for MONTROSE and its subsidiary, CTEH, was using his position to cause Plaintiff to engage in commercial sexual acts by means of use of force, threats of force, fraud, or coercion.

As a direct and proximate result of the actions of MONTROSE, through its subsidiary, CTEH, Plaintiff has suffered personal injuries, including severe emotional distress, physical injuries, and economic losses, and these injuries continue.

## XXVIII - DAMAGES

427.    As result of the Defendants' tortious misconduct, as set forth above in Count 1 through Count 8, Plaintiff is entitled to recover general and special damages reasonable under the premises, as contemplated by the Louisiana Civil Code, Title VII of the Civil Rights act, the TVPA, and LSA-R.S. 46:2163, including but not limited to actual damages, compensatory damages, back pay, front pay, punitive damages, court costs and attorney's fees, and treble damages.

## XXIX - REQUEST FOR TRIAL BY JURY

428.   Pursuant to Fed. R. Civ. P. 38(a), Plaintiff demands trial by jury, consisting of no fewer than twelve members, on all issues of fact and law triable to a jury.

## XXX - PRAYER FOR RELIF

**WHEREFORE,** plaintiff, ALICIA KELLY, prays:

A.    That the Defendants, CENTER FOR TOXICOLOGY & ENVIRONMENTAL HEALTH, a subsidiary of MONTROSE ENVIRONMENTAL GROUP, INC., a Delaware Corporation, LIONSGATE ENTERTAINMENT, INC., a California Corporation, LIONSGATE TELEVISION, INC., a California Corporation, JERRY BRUCKHEIMER, INC., a California Corporation, JERRY BRUCHKHEIMER TELEVISION, INC., a subsidiary of JERRY BRUCKHEIMER FILMS, INC., a California Corporation, APPLE, INC., a California Corporation, APPLE PRODUCTIONS, INC., a California Corporation, APPLE STUDIOS, a subsidiary of APPLE, INC., a California Corporation, JASON SEALS, CHASE SELBY, and JASON BECKNER, be served with copies of Summons and this Complaint for damages;

B.    That they serve their answers thereto;

C.    That there be trial by jury;

D.    That after the expiration of all lawful delays and due proceedings are had, there be judgement entered in Plaintiff's favor and against Defendants, jointly, severally, and *in solido*, for:

1.    General damages reasonable under these premises;

2.    Special damages reasonable under these premises;

3.      Punitive damages Reasonable under these premises;

4.      Treble damages;

5.      Legal interest on all money damages awarded from the date of judicial

        demand until the same are fully paid;

6.      Pre-judgment interest where provided by law;

7.      All costs and attorney fees that are allowed by law; and

8.      All other damages as contemplated by the Louisiana Civil Code, Title VII

        of the Civil Rights act, the TVPA, and LSA-R.S. 46:2163, which will be

        shown at a trial of this matter; and

9.      Such other relief as the interests of justice may require.


                                Respectfully submitted,

                                /s/ Kristi S. Schubert
                                FRANK E. LAMOTHE, III, (#07945)
                                KRISTI S. SCHUBERT (#34870)
                                JULIEN G. LMAOTHE (#38313)
                                **LAMOTHE LAW FIRM, LLC**
                                400 Poydras Street, Suite 1760
                                New Orleans, LA 70130
                                Telephone: (504) 704-1414
                                E-Mail: felamothe@lamothefirm.com
                                         kschubert@lamothefirm.com
                                         jlamothe@lamothefirm.com

                                *Attorneys for Plaintiff, Alicia Kelly*

**CERTIFICATE OF SERVICE**

I certify that on March 16, 2022, the foregoing document was filed electronically with the Clerk of Court using the Court's CM/ECF system.  Notice of this filing will be sent to counsel for all parties by operation of the CM/ECF system.

*/s/ Kristi S. Schubert*
KRISTI S. SCHUBERT
